KIDDER M. MOORE AND J. C. MONTFORD, EXECUTORS, &c., APPELLANTS, vs. JAMES J. FELKEL AND WIFE, JOHN MC-COY AND WIFE, AND DANIEL HAMBLETON, APPELLEES.

Where a defendant was both Executor and Guardian of an infant distributee of the estate and had been sued at law upon his Guardian bond and a recovery obtained against him, upon a bill filed for an account against him in his two-fold character, he pleaded that recovery as a full bar to a decree: *Held*, that the bar was good to the extent of the matters put in issue and adjusted by the judgment at law.

The statute which authorizes Executors, Administrators and Guardians to put out money at interest (Thompson's Digest, 207, sec. 9, § 2,) is not restricted to the money belonging to *minors*, but embraces in its spirit and meaning all money belonging to the estate which may come to their hands during the process of administration.

The provision of the statute requires that loans of this character shall be secured by mortgage and is clearly mandatory; and if an Executor disregard the requirement and make a loan upon personal security, he does so at his peril, and, if a loss occur, he is responsible for it.

In the settlement of an Executor's account, "commissions," strictly speaking, are allowed under our statute only "on money arising from the sale of personal property, slaves and lands of the deceased." The term *per cent.*, occurring in the statute, is used only as a measure by which to ascertain the amount of compensation for this particular character of service. For other services, such as the collection of money not arising from sales and for the disbursment of the same, care and attention to and management of the property of the estate, the statute directs the allowance of "a fair and just compensation," and, in determining what would be a fair and just compensation, reference ought always to be had to the kind of property in the hands of the Executor as involving more or less trouble and expense in the management of the same, the value of the estate and the time that it may have necessarily remained under his management.

The organization of the State government which dispensed with the "County Courts" did not abolish the *stated terms* thereof when sitting as Courts of Ordinary, but its powers and duties in this respect being transferred to the Judges of Probate, they are required to observe these terms, and Executors, Administrators and Guardians are required to make their annual settlements at the first term in each and every year, under the penalty of a forfeiture of their commissions. DuPONT, J., dissenting.

Where, in the settlement of an Executor's account, the annual balance is struck, either for or against him, the rate of interest to be charged upon said balance is the rate existing by law at the date of the said balance.

In a bill to open a *stated account*, the *onus probandi* is always upon the party who seeks to surcharge and falsify; but where an Executor was also the Guardian of a minor, his settlements in the Probate Office will not *generally* be viewed as "*accounts stated*," and the *onus* will be upon him to sustain the items of the settlement.

The appellees, Felkel and wife, and John McCoy and wife, as complainants in the Court below, filed their bill in Leon Circuit Court against the appellants as Executors of William Turner, deceased, for the purpose of restating and resettling their accounts as such Executors. Daniel Hambleton, as administrator of his wife, who was a daughter and legatee of said William Turner, filed a bill for the same purpose. Elizabeth, the wife of said Felkel, and Tabitha, the wife of said McCoy, were also general legatees of said William Turner.

William Turner executed his will on the 13th day of December, 1840, which was admitted to probate on the 12th day of Jan'y, 1841, and on the same day the said K. M. Moore and Jno. C. Montford qualified as executors thereof. They entered upon and continued in the administration of the estate as executors until the 8th day of January, 1847, about which time a settlement was made with the adult distributees and the said K. M. Moore was appointed guardian of the said Elizabeth, wife of said Felkel, and Tabitha, wife of said McCoy, who were then infants. Afterwards Felkel and wife instituted a suit in Leon Circuit Court against said K. M. Moore, on his guardian bond, and recovered a judgment for the sum of $928 05-100, which judgment is set up by way of plea as a bar to any decree in this case in favor of Felkel and wife.

The complainants, proceeding to surchage and falsify

the returns made by the said executors to the Court of Probate, allege in the bill :

"*First.* In the returns of the year 1844, an insolvent list of $3,657 00 is allowed, whereas your orators and oratrixes are informed and believe, and so charge that several persons named in said list were solvent at the time, and some of whom are still solvent, and that these debts might, with due diligence, have been recovered, but having become barred by the statute of limitations, they are now irrecoverably lost by the laches, the want of proper exertion and common prudence on the part of the said Kidder M. Moore, chief acting executor, as your orators and oratrixes do hereby aver and charge. Whereupon this item being a falsification in legal parlance, your orators and oratrixes, respectfully submit whether the said Kidder M. Moore, executor, is not responsible for the debts so lost, and and should not be compelled to indemnify the legatees or heirs at law, and whether he is not at least bound *to exculpate himself from this charge.*

*Second.* Commissions are allowed *on this same insolvent list,* on what principles your orators and oratrixes are at a loss to perceive, commissions being allowed by the statute only on *collections* and *disbursements* for an estate, and thereupon they except to this item as a surcharge.

*Third.* In the returns of the same year, (1844,) there is an item of $1695 for sale of town lots, and another of $271 20 for interest on the purchase money, in Union Bank bills. To these items your orators and oratrixes except as a surcharge.

An executor may not sell real estate only under authority of a court of competent jurisdiction, whose order prescribes the terms of sale.

In the year 1844, Union Bank bills were 33⅓ per cent. discount, as claimed by the said executors' returns, and

your orators and oratrixes contend that such currency should not have been received in payment either of principal or interest under any *circumstances upon such sales*, and therefore they submit whether the said executors are not liable for the amount so lost by this depreciation, unless they offer to this court some satisfactory account and explanation.

*Fourth.* In the same returns Craig and Lockerman's note is included as *insolvent.* Your orators and oratrixes allege that this note was taken for this amount of money *loaned ; personal* security was taken instead of *mortgage*, as the statute imperatively requires, and they contend that the said Kidder M. Moore, executor, or both he and Montford, if both acted therein, are liable for this amount, with interest, to the legatees or heirs at law, and they submit whether said executor or both, should not be held to indemnify the parties interested, and compelled to refund.

*Fifth.* Again, in the same returns is an item of $750, retained by said executors without interest, which your orators and oratrixes insist should be charged against them.

And the said executors should have been charged in these returns with $48 00 interest on $610 83 balance from last account.

*Sixth.* In the returns of 1847, there is an item of $479, for care, superintendence and responsibility about the slaves of said estate.

The statute allowing commissions only for collections and disbursements, this claim, as your orators and oratrixes contend, is inadmissable, unless extraordinary pains, diligence, care, trouble, and attention were necessary and bestowed, but they allege that this was not the case, and submit whether, unless all this be shown, this claim ought to be allowed.

*Seventh.* In the returns of this year, an item of $57 90

is allowed for the *distribution of real estate.* The distribution of the real estate being a proceeding under an order or decree of a court of competent jurisdiction, upon application of devises or heirs at law, your orators and oratrixes submit whether an executor is, for such an act, entitled to compensation, and they contend he is not, unless he shows what services he rendered, and the necessity thereof.

*Eighth.* The returns of 1849 contain an item of $264 00 for depreciation of Union Bank bills received on Mattox's note due 1st January, 1842, and $63 36 depreciation on interest collected on the same, and also, $396 00 depreciation on the Union Bank bills collected of Mattox on his note due 1st January, 1843, and $63 36 depreciation on interest collected on said last mentioned note.

This is a surcharge, and complainants refer to their exception under specification No. 3, for their reason that such items should be rejected, and the executors held responsible for the amount of such depreciation.

*Ninth.* In the returns for 1849, the executor is credited with $29 41 retained to settle Court charges; your orators and oratrixes submit whether this is a proper credit, unless it can be shown that the same has been expended.

*Tenth.* In the returns for 1849, the executors are charged with *simple* interest for five years on $225 90, whereas your orators and oratrixes aver and charge that they are liable for *compound* interest on the same, and submit whether they should not be held accountable therefor, unless some satisfactory reason be offered otherwise.

*Eleventh.* In addition to the commissions heretofore objected to, your orators and oratrixes complain and aver, that said Executors, Moore and Montford, have never at any time given notice as the statute requires, of the presentation and settlement of their annual accounts, or any

of them. Your orators and oratrixes therefore contend and charge that said executors have *forfeited all claim* to commissions in their various accounts, and submit to this honorable Court whether such commissions should not be dissallowed."

The defendants, in their answer, allege, that they proceeded promptly to execute the will of their testator, and to administer the said estate, by making sales of a portion of the real estate and of the personal property; that at the time of these sales the currency in the shape of bank notes consisted entirely, in Middle Florida, of the notes of the Union Bank, an institution which had acquired the confidence of the people and especially those in the vicinity of the capital; that, although the Bank had suspended specie payments, it held out assurances that it was solvent and would soon resume specie payments; that these assurances were readily confided in, and up to the time when the defendants became executors, and for some time after, the available moneyed resources of the people of Middle Florida were represented by the notes of the said Union Bank, which, from necessity, were received and passed from hand to hand in business transactions; that there was comparatively little money in the country, available by way of lawful tender, and that property of all kinds which was sold for lawful money about these dates was disposed of at the most ruinous sacrifices, and that sales for Union Bank money commanded prices so far advanced above specie rates as to compensate at least double for the depreciation of the notes of said Bank. The defendants, therefore, insisted that all their acts touching sales for Union Bank notes ought to be sanctioned and ratified.

The defendants also alleged, that after disposing of all the chattel property, and after the sales of part of the real

7

estate, they were in possession of a considerable sum in notes of the Union Bank, besides the sum, in like notes, which the testator left at his death, which they deemed themselves authorized to dispose of in like manner, upon like security, as they had disposed of the personal assets; that a public sale of the Bank notes was not necessary, as they had a market value and could be as well disposed of by private arrangement; that, in March, 1841, they arranged with William P. Craig for the loan to said Craig of Union Bank notes to the amount of $1,612 50, said Craig giving his note, with Edward Lockerman as security, payable for a like sum in current money; that at that date the said Craig and Lockerman were deemed to be solvent and their note for that sum was regarded as good as any note usually taken in business transactions, the said Lockerman being supposed to be worth fifty thousand dollars, and the said Craig, though somewhat in arrears, being deemed solvent and being in possession of a large estate, which yielded a large annual income; that in this transaction they exercised their best judgment and acted fairly and honestly, and conscientiously, for the best interest of the estate, taking the same character of security as they had taken at the sales of personal property; that although the loss of that amount in Union Bank notes has been the result, yet they could not foresee the subsequent failure of Craig and Lockerman, and insist that they ought not, in equity, to be held responsible for the amount of this loan. And defendants further allege, that the statute in reference to the loan of monies of infants by guardians and other trustees is not in any wise applicable to the facts of this case.

The defendants also allege a settlement of their accounts in the Probate office, in which settlement the Craig and Lockerman note was credited after due notice, and in accordance with which they paid up in full the distributive

portions of three of the heirs of William Turner, deceased, and took receipts in full from them with the consent to the discharge of defendants as executors; that Hambleton, being dissatisfied with the settlement so far as the allowance of the Craig note was concerned, took an appeal, but they allege, that upon the record presented on said appeal to the Appellate Court, the material facts did not appear.

The defendants also allege, that complainants, Felkel and wife, well knowing all the facts, did institute an action at law against defendant Moore, on his guardian bond, as guardian of Elizabeth, the wife of said Felkel, to recover the amount due by said Moore, as the balance due upon his guardian account; that afterwards they recovered a judgment for such balance, which judgment has been fully paid and satisfied; that all the estate received by defendant Moore, as guardian, consisted of the balance in his hands as executor belonging to said Elizabeth, wife of said Felkel. The judgment aforesaid is pleaded as a bar to the relief prayed for by Felkel and wife.

Defendants also allege, as to so much of the bill as seeks to falsify the credit allowed as commissions on insolvent list, that, although they failed to collect said sums, they were, nevertheless, put to great trouble, expense and loss of time in their efforts to make settlements and in looking after the debtors and in directing and superintending suits, &c., for all of which the Judge of Probate felt authorized to make an allowance, and which allowance ought to be sustained.

On the 7th day of January, 1856, the following order was made by the Court below, viz:

" This cause having been submitted to the Court, and the Court having considered the same, doth order, adjudge and decree that the recovery by the complainants, Felkel and wife, in a suit against K. M. Moore, one of the executors, who was also guardian, upon his bond as guardian,

is no bar to a suit in equity against defendants Moore and Montford as executors.

And it is further ordered and adjudged and decreed, that this cause be and is hereby referred to Hugh Archer, Jr., one of the Masters of this Court, to examine into and state the accounts of K. M. Moore and J. C. Montford, or either of them, as executors of the last will, &c., of William Turner, deceased, and, in stating such account, the said Master, among other things, shall pursue the following instructions, viz:

1st. The executors are to be charged with the amount of the Craig and Lockerman note.

2nd. The Master shall take testimony in reference to the insolvent list, and shall charge the executors with the notes of those who were proved to have been solvent at the time.

3rd. Commissions not to be allowed the executors on the insolvent list.

4th. In reference to the item of $750, the Master shall charge interest on the same, if he shall be satisfied from evidence to be taken that the money was not kept in hand by the executors necessarily for the use of the estate.

5th. In reference to the item of $479, for commissions on value of lands and slaves, the Master shall not credit the executors therewith.

6th. The Master shall compound the interest on the item of $225 92.

7th. The item of $29 41 shall not be charged by the Master to the executors.

8th. As to the item of $1,695, arising from sales, &c., the Court directs, that as the will authorized the executors to sell, and as the subsequent revocation of the will did not invalidate the sale, the Master will take proof in regard to the propriety of selling for Union money; and if the Master shall be satisfied that the executors were autho-

rized, under the circumstances, to sell for Union money, the executors are to be allowed the discount of that date.

9th. The executors are to be permitted to prove before the Master their claim for compensation for trouble in managing the estate, exclusive of commissions, and are to be allowed by the Master a reasonable sum.

10th. The Master shall report the number of distributees entitled to distribution out of the estate of William Turner, deceased, their names and the respective amounts to which they may be entitled, the grand-children of said William Turner, deceased, taking *per capita* under the will as to the personalty thereby conveyed."

Afterwards, the complainant's counsel filed the following exceptions, and asked further instructions as follows, viz:

" Complainants' counsel except to the 3rd of the instructions given, on the ground that it does not instruct the Master to compute interest at the rate of eight per cent. per annum on sums chargeable against the executors prior to the —— day of ————, 1845, from the time when such sums may have become chargeable up to the date of the Master's report, but only up to the former period, to wit: the the —— day of ————, 1845, when the rate of interest was changed by the General Assembly; and the counsel now further ask the following instructions:

1st. That if the said executors shall fail to show to the satisfaction of the Master that they rendered their accounts annually in the Court of Ordinary, before the Judge of Probate and upon due notice, as the law requires, then the burthen of proof devolves on said executors in reference to all *items* in such accounts as are the subject matter of surcharge and falsification in complainant's bill.

2nd. That the burthen of proof devolves upon the execu-

tors in reference to all matters of surcharge and falsification contained and specified in said bill."

And, on the 4th day of April, 1856, the following additional order was made by the Court below:

"This day this cause came on to be heard upon certain instructions which the solicitors of the complainants submitted to the Court touching the matters referred to the Master by a previous order passed in the cause, whereupon, on consideration, the Court doth adjudge, order and decree as follows:

1st. That the Master charge the executors with interest compounded on the annual balances.

2nd. That said Master charge the executors with interest on the Craig and Lockerman note.

3rd. That upon all sums chargeable to the executors prior to the —— day of ——, 1844, when the legal rate of interest was allowed by statute, the Master shall charge said executors with 8 per cent. per annum interest, and, from that period up to the date of his report, with interest at the rate of 6 per cent. per annum.

4th. That said Master, instead of allowing the discount, upon Union money charged by said executors against the estate, shall allow such loss only as they actually sustained by receiving such money. So much of the last order as conflicts with this is hereby vacated.

5th. That said Master shall not credit the executors with commissions claimed by them in their accounts, which they failed to render at the time prescribed by law for making their annual settlements, viz: at the first term in each year of the late County Court of Leon county and at the first term in each year of the Probate Court since its establishment."

*James T. Archer* and *M. A. Long* for the Appellants.

*D. W. Gwynn, A. L. Woodward* and *M. D. Papy* for Appellees.

DuPont, J., delivered the following opinion :

This is a bill in equity, filed in the Circuit Court of Leon County, by the appellees, as complainants in that Court, against the appellants, and has for its object the opening and re-settlement of their accounts as the executors of the last will and testament of William Turner, deceased. There is also presented for our consideration an original and independent bill, filed in the same Court, by Daniel Hambleton, against the same executors and with the same object, in the character of administrator upon the estate of his deceased wife, who was a distributee under the will of the testator, and whose interest as such was identical or similar to that claimed by the complainants in the principal bill. As the object of the two bills is the same, and the position and interests of the complainants identical, they might well have joined as complainants, and there was no impropriety on the part of the Chancellor in consenting to consider them as one, and rendering one decree as applicable to both.

The appeal comes before us (by virtue of a provision of the statute,) upon an interlocutory decree, pronouncing upon a plea of former recovery, and ordering a reference to the Master for an account, with certain instructions.

The appellants, in their petition of appeal, claim a reversal of the decree upon the ground that Felkel and wife's recovery on the guardian bond concluded them to have an account against them in their character of executors.

They also appeal from that portion of the decree ordering a reference to the Master, and set forth the following grounds, viz :

1st. "There is error in directing the executors to be charged with the amount of Craig's note."

2d. " The refusal of commissions ought not to be sustained."

The appellees, by way of cross-appeal, except to some of the instructions contained in the order of reference, and ask that they may be so modified as to direct—1st. That the interest to be charged upon balances against the executors be estimated at the rate of eight per cent. throughout the entire range of the accounts, and not to be affected by the reduction of the rate of interest provided for by the act of 1844. 2d. That the burthen of proof be devolved upon the executors in reference to all matters of surcharge and falsification contained and specified in the bill.

The portion of the decree which is applicable to the first exception taken by the appellants, is as follows : " This cause having been submitted to the Court, and the Court having considered the same, doth order, adjudge and decree, that the recovery by the complainants, Felkel and wife, in a suit against K. M. Moore, one of the executors, who was also guardian, upon his bond as guardian, is no bar to a suit in equity against defendants, Moore and Montford, as executors."

For a due appreciation of the objection to this portion of the decree, and in order that the conclusion of the majority on the point may be comprehended and fully understood, it is proper to state the facts and circumstances out of which the objection grows. The bill and exhibits show that the testator, William Turner, executed his will on the 13th day of December, A. D. 1840 ; that it was admitted to probate on the 12th day of January, A. D. 1841, and on the same day Moore and Montford qualified as executors thereof; that they entered upon and continued in the administration of the estate as executors until the 8th day of January, A. D. 1847, about which time a settlement was made with the adult distributees, and the said Moore was appointed the guardian of the two complainants, who were

then infants, Elizabeth, the wife of Felkel, and Tabitha, the wife of McCoy. That subsequently Felkel and wife caused a suit to be instituted, in the Circuit Court of Leon County, against Moore, on his guardian bond, and recovered against him as guardian a judgment for $928 05. It is that judgment that is set up in the plea of former recovery, as a bar to a decree in this suit in favor of Felkel and wife.

The conclusion of the majority of the Court on this point (the reason for which will be given in a separate opinion) is, that the decree will be reversed, and that the investigation into the accounts must be so conducted that the matters put in issue and adjusted by the judgment shall not be again enquired into.

The position of the majority, as I understand it, is, that the judgment at law is a bar to the extent of the matters which were put in issue in the suit in which it was obtained, and that what those matters were is to be a subject of enquiry upon the taking of the account as of matters *in pais*. This view of the case, in my opinion, effectually destroys the conclusiveness of the judgment by depriving it of the benefit arising from the *legal presumption* that attaches to every judgment at law, viz: that all matters which were put in issue *by the pleadings* must be taken to have been passed upon by the judgment. To illustrate my meaning, I will observe that Felkel and wife, in their bill, complain of Moore, the defendant, in his two-fold character of executor and guardian. Moore pleads in bar a judgment recovered by them on the guardian bond, and the question is, how and to what extent shall it avail him in this suit? Evidently it is no bar to the investigation of his accounts as executor, but with respect to his accounts as guardian, it is, upon well settled principles, perfectly *conclusive.* Suppose this were a second suit in a Court of Law upon the guardian bond, could there be any question as

8

to the extent and conclusiveness of the former recovery?
And yet I understand the rule to be that "a judgment on
the merits which will bar any other suit at law will also
bar a suit in chancery on the same cause of action." (7 J.
J. Marsh., 68 and 70.) I know that there are cases in
which Courts of Equity have not only disregarded the
plea of a former recovery, but have interfered to set the
judgment aside; but, to induce a Court thus to act, there
must be some new equity set up in the bill by distinct al-
legation, such as fraud, mistake or surprise, which would
make it against conscience that the defendant should avail
himself of the bar. Dan'l Ch. Prac., 706; 1 Eq. Dig.,
676; 1 Wash. C. C. R., 320. In this bill there is no such
allegation with respect to the judgment pleaded.

To adopt the views of the majority, it seems to me,
would be attended with peculiar hardship to defendants,
and subject them to continual harrassment. The general
rule to be deduced from the numerous cases involving a
discussion of this subject is, that the judgment of a Court
of competent jurisdiction, obtained in a suit between the
same parties or their privies, and for the same subject
matter, being still in force or fully satisfied, concludes the
rights of the parties thereto. (5 Bac. Abr., tit. Pleas and
Pleading; 2 Dan'l Ch. Prac., 758; Irwin vs. Knox, 10
John. R., 374.)

The very point now under consideration arose and was
authoritatively ruled in Thornton vs. Campbell, (6 Fla. R.,
546,) a case decided by this Court at its last term. The
rule there laid down is, "that a second suit shall not be
allowed when the judgment in the first, whether upon con-
fession, demurrer or verdict, and still in force, was given
by a Court of competent jurisdiction and was for the same
subject matter, for the same object and the case was tried
upon the merits."

Applying the rule to the case under consideration, and

it is very manifest that the defence set up by way of plea is a good bar to any decree against Moore for any of his acts as guardian of the wife of Felkel; but it is only to this extent that it ought to be permitted to avail him. His character of executor is entirely distinct from that of guardian and his acts in these respective characters impose liabilities very different in their extent and operation. In the former character, he and his co-executor are alone liable for any mal-administration of the estate or waste of its assets, whereas his acts in the latter character affect not only himself but his sureties on his guardian bond. The bill in this case alleges, in reference to his character and conduct as guardian, no fraud, no mistake, no surprise, no newly discovered right, and, consequently, the plea does not come within the exception.

Numerous cases were cited in the argument of this point by the counsel on both sides, going to show the degree of liability incurred by a party exercising the two offices of executor and guardian; but I do not think that they throw any light upon the point now immediately under discussion, to wit: the validity and operative effect of the plea as a good and full bar to the decree sought in this suit.

The result of these views is, that the decree pronounced by the Chancellor ought, in my opinion, to be so far modified as to exclude from the investigation before the Master the accounts of Moore, rendered by him as the guardian of Elizabeth Felkel; and, as to his other ward, the Master, in taking the account, ought to discriminate between what may be found to be due by him as guardian and the amount that may be due by him as executor.

The second point set forth by the appellants as a ground of appeal, is an exception, in the following words, to the instruction embraced in the order of reference, viz: "There is error in directing the executors to be charged with the amount of the Craig and Lockerman note."

The instruction referred to by this exception is as follows: "The executors are to be charged with the amount of the Craig and Lockerman note;" and, by further order, it is directed: "That the Master charge the executors with interest on the Craig and Lockerman note."

A brief history of this transaction is necessary to the proper understanding of our views in relation thereto. It seems that about the year 1841, the defendant Moore, who was the acting exector, found himself in possession of a large amount of depreciated bank notes, derived partly from sales of property of the estate, and partly from funds on hand at the death of the testator; that this species of funds constituted almost the entire currency of the country, and was used as money, but at a great depreciation, for the payment of debts, the purchase of property, &c. That Craig, about this period, borrowed from the executor a portion of these depreciated notes, agreeing to repay the nominal amount borrowed, at the expiration of twelve months, in par funds. He gave his promissory note for the sum borrowed, with Lockerman as his surety, both of them being at the time in good credit, and indeed esteemed wealthy. They subsequently became insolvent, and the loan proved a total loss. In a settlement of the executors' account by the Judge of Probate, this amount was allowed as a credit thereon, and this allowance constitutes one of the grounds of complaint set forth by the complainants in their bill.

For the appellant it was contended that the allowance by the Judge of Probate was correct and proper, and that the farthest that the instruction ought to have gone should have been to direct an enquiry to be had in relation to the fairness of the loan, and that in the absence of any proof to establish that the executor had designed to make gains for himself out of the transaction, the credit should be allowed to stand. It was further insisted for the appellants,

that the statute which authorizes Executors, Administrators and Guardians to loan out money in their hands—(Thomp. Dig., 207, Sec. 9, § 2)—did not apply to this loan; that the words of the statute showed that it was intended to apply only to money belonging to " minors," and as the estate was in process of administration at the date of the loan, it could not be said that any portion of this amount belonged to a " minor."

Upon the part of the appellees, it was insisted that this case was fully within the *spirit* of the statute, and that all such loans are required to be made upon such "*mortgage security*" as should be approved by the Court of Probate; that, the loan having been made upon *personal* security only, the executor, in making it, assumed the risk and could not throw the loss upon the estate.

These conflicting views involve a construction and interpretation of the act, and we are free to admit that the words, strictly construed, present some difficulty in readily arriving at a conclusion with respect to their true meaning and import. The particular clause of the statute under consideration is in these words : "Executors, administrators and guardians may, by leave of the Court, retain in their possession the money of any minor, paying for the same lawful interest, or shall, under the direction of the Court, put out the money of the minor at interest upon such mortgage security as said Court shall allow; and if such security be taken *bona fide* and without fraud, and shall prove insufficient, it shall be the loss of the minor," &c.

To admit the position of the appellants' counsel would be to declare the act inoperative so far as it refers to executors and administrators ; for it is no part of the duty of an executor or an administrator to loan out the money belonging to minors. The words " executors and administrators " were certainly intended to have some meaning in

the connection in which they are found, and however true it may be that the money in the hand of an executor or administrator cannot properly be said to belong to a *minor* until the debts of the estate have all been paid, yet we think that it would be doing violence to the obvious meaning of the act to lay the stress upon the word *minor* which the counsel contends for. There can be no doubt but that the act was intended to embrace all money belonging to an estate being in process of administration. This is evidently in accordance with the *spirit* of the statute, and in giving it this interpretation, we certainly invade none of the well known rules applicable to the construction of statutes. The very point now under discussion has already received an adjudication by this Court, and, although the facts of that case were erroneously brought before the Court, yet the question was made upon the true interpretation of the statute and definitely decided. *Vide* Moore and Montford, ex'ors vs. Hambleton, 4 Florida R., 112.

The provision of the statute, requiring that loans of this character, when made, shall be secured by mortgage, is clearly *mandatory*, and if an executor disregard the requirement and make a loan of the money of the estate upon *personal* security, he does so at his peril, and we are aware of no principle in equity jurisprudence which will relieve him from the consequences of his act—a personal loss of the loan.

However harshly this ruling may operate upon this executor, who, for aught that appears, has honestly discharged his duties to the estate, it is our province only to declare the law, and not to make it. The decree of the Chancellor upon this point is, therefore, sustained, with this modification, however, that the executor be charged only the *value* of the funds at the date of the loan.

The next and last ground of appeal by the appellants is from so much of the instructions to the Master as directs

the disallowance of *commissions* on certain items specified. The instructions on this point are the following:

" Commissions not to be allowed the executor on the insolvent list."  " In reference to the item of $479, for commissions on value of lands and slaves, the Master shall not credit the executor therewith."  ( *Vide* the instructions embraced in the first decree of January 7, 1856, and numbered 3 and 5 respectively.)

The consideration of this point involves an examination of the statute regulating the commissions and compensation of these officers.   The provision on this subject may be found in the first section of the act of 1833, (*vide* Duval Comp., 186,) and is as follows :

"Executors and administrators shall be allowed all reasonable charges on account of disbursement for funeral expenses and in the administration of the estate of the person deceased, and shall also be allowed a fair and just compensation for their services, and also a compensation not exceeding six per cent. on money arising from the sale of personal property, slaves and lands of the deceased."

According to the words of the act, the compensation which is allowed by way of a *per centage* is only " on money arising from the sale of personal property, slaves and lands of the deceased."   In this connection, the term per cent. is used only as a *measure* by which to ascertain the amount of compensation for this particular service. For other services, such as the collection of money not arising from sales, and for the disbursement of the same, care and attention to and management of the property of the estate from year to year, it would seem that a *different measure* by which to ascertain the amount of compensation to be allowed was intended to be observed.   We are sustained in this view by reference to the provision on the subject of compensation contained in the act of 1828, (*vide* Duval Comp., 176,) which prescribed a compensation not

exceeding six per cent. " *on the whole amount of the personal estate*," and which it was the design of the act of 1833 to restrict to a per centage on money arising from sales. The Chancellor in his decree has fully provided for carrying out this view of the law in the terms of the 9th instruction embraced in the first decree. Under that instruction it will be competent for the Master to consider the kind of property in the hands of the executors as involving more or less trouble and expense in the management of the same, the value of the estate and the time that it may have remained under their management, and to allow therefor, in the words of the statute, " a fair and just compensation." We, therefore, sustain the instructions here referred to and overrule the appeal taken therefrom.

The fifth instruction embraced in the order for further instructions passed on the 4th day of April, 1856, also refers to the matter of commissions, and is therefore legitimately embraced within the exception set forth in the petition of appeal. The instruction is in these words :

" That the Master shall not credit the executors with the commissions claimed by them in their accounts, which they failed to render at the time prescribed by law for making their annual settlements, viz: at the first term of the late County Court of Leon county, and at the first term of each year of the Probate Court since its establishment."

The majority of the Court, embracing the Chief Justice and the other Associate Justice, sustain this instruction, and therefore the exception, so far as it relates to it, is also overruled. The views of the majority upon this point will be given by them in a separate opinion. The ground upon which they base their conclusion, so far as I comprehend it, is the following : "That the *statute* prescribes the time and requires that the Court of Probate should hold *stated terms* for the settlement of the accounts of executors, administrators and guardians." I *dissent* from this posi-

tion, and hold that there is no statute of force requiring the Court of Probate to hold stated terms. That I may be understood upon this point, it is necessary briefly to trace the history of the law as contained in the successive statutes passed with reference to this subject.

By reference to " Duval's Compilation," it will be noted, that, down to the date of the passage of the act of 1834, there was no time prescribed for the settlement of accounts, but the County Courts, being always open for the transaction of business appertaining to a Court of Ordinary, the executors and administrators were at liberty to present their accounts for settlement at any time during the current year. Under this system there arose two evils, which were greatly complained of at that time : First, that there was no time *fixed by law* at which a party interested might appear to contest the accounts, and, secondly, that the " *notice* " provided for by the 36th section of the act of 1828 (being merely by "*posting*," which might be immediately destroyed,) was not of such a character as ought to be permitted to bind the parties interested in the settlements. To remedy these two evils would seem to have been the chief aim and design of the act of 1834. At that period of our territorial history the then County Court held pleas of civil suits for the collection of debts, and the law prescribed for them two stated terms in each and every year. The Judge of the Court was also invested with the powers and functions of the Ordinary. The original act will be found in Duval's Compilation, page 188, section 1, and is in these words : " That the Judges of the respective *County Courts* shall, at the first term thereof in each and every year, as soon as they shall have disposed of the civil business on the several dockets of the Court, cause it to be proclaimed at the door of the Court House that the Court will then be open for the settlement of the accounts of executors," &c.

9

In Thomp. Dig., the phraseology of this section is very properly changed, and it was made to conform to the state of the law as it was supposed to exist under the State organization, which wholly dispensed with the old " County Courts," as tribunals for the collection of debts, and for the transaction of business pertaining to the Ordinary, the Legislature provided for the appointment of an officer to be called the Judge of Probate. (Thomp. Dig. 57.) It will be seen on reference that the words " County Courts," used in the original act, give place in the Digest to the words " Courts of Probate ;" and that the words " *as soon as they shall have disposed of the civil business on the several dockets of the Court,*" are entirely omitted.

The argument chiefly relied on to sustain the conclusion of the majority is, that all the powers and duties of the judges of the late County Courts, when acting as the Ordinary, having been transferred to the present Judges of Probate, it followed as a legitimate consequence, that the new officer should, as one of his *duties* to be performed, hold stated terms of his Court, at the same time and places prescribed for the holding of the old County Court.

I cannot give the wore duty, in the connection in which it is used, the application here contended for. With all respect for, and deference to the opinion of my associates, it seems to me that such an application of the term is unwarranted by any rule of construction, and that it fails to speak the mind of the Legislature. In this, I think I am sustained by several considerations.

It must be remembered that stated terms for the old County Court, when sitting for the purpose of holding pleas, were contemporaneous with the first organization of that tribunal, in the early history of our territorial existence ; and that it was not until the passage of the act of 1834, that the provision requiring executors to settle their accounts at the first term thereof in each and every year,

was adopted.   The *terms* were established originally for the regulation of these Courts, *when sitting as Courts of Common Pleas ;* and with the abolition of that organization, I cannot resist the conclusion that the terms were also abolished.

Again, if it were the intention of the Legislature to retain these stated terms for the regulation of the Courts of Probate, why should they have deemed it necessary, by express legislative enactment, to declare that "the Judge of Probate shall hold his Courts at the *places* now prescribed by law for holding the County Courts ?" (Thomp. Dig., 58, § 6.)   Did not the old law prescribe the *places* where the County Courts should be held, as fully as it had the *times ?*   And if the old law were to be considered of force in respect to the *time*, why not also as to the *place ?* and where then the necessity of declaring the place ?   This simple fact seems to me to afford conclusive proof as to the intention of the Legislature.

If further argument were necessary to sustain my position, I might legitimately refer to the universal disregard and non-observance, by the Judges of Probate throughout the entire State, of the stated terms prescribed in the old law—the universal and uninterrupted acquiescence of all parties, for a period of more than ten years, in this assumed dereliction of duty, by an important class of public officers —the fact that while alterations are, from session to session of the Legislature, made in the terms of the other courts, not a single instance has occurred, since the commencement of the State organization, in which an alteration of these old terms has been made, or even sought to be made.   But if the conclusion of the majority be well founded, then the singular anomaly exists in all of the new counties which have been laid-off and established since the organization of the State government, that while they are each provided

with a Court of Probate, no *time* has been prescribed in either of them for the holding of its terms.

Entertaining these views of the law, I cannot yield my assent to the instruction embraced in the decree, which, by its very terms, pre-supposes the existence of *stated terms* for the session of the Probate Court.

I esteem it a salutary rule which commends itself to our observance, that where a particular construction of a statute under which important interests may have grown up, has been acquiesced in for a long series of years, it ought not to be disturbed, unless so manifestly erroneous as to admit of no doubt upon the subject.

The forfeiture of commissions for failing to make "*annual*" returns, is intended by the statute as a penalty to enforce promptness, on the part of executors, administrators and guardians, and the view which I have taken of the statute will in no measure tend to defeat that wise policy. The rule might be, that a forfeiture shall accrue only in cases where the returns are so *delayed* that the accounts of one year are permitted to run to the time at which the returns of the next succeeding year ought to be made.— Such a rule is of very simple application, and would effectually attain the object contemplated by the statute.

The first point made by the cross-appeal is in reference to the *third* further instruction, and raises the question whether the rate of interest directed to be charged upon the annual balances shall conform, throughout the entire range of the accounts, to the rate established by law at the time that the first balance is to be struck, viz: eight per cent., or whether the rate shall be changed after the year 1844, in which year the rate of interest was reduced to six per cent. The instruction referred to adopts the latter view, and we think it is correct. (The C. J. dissenting.)

The next point brought up by the cross-appeal raises the question with respect to the *onus probandi*, in a case of

" surcharge and falsification." The general doctrine upon this subject is well defined in the books, and admits of no doubt.   The rule is, that " where a party has liberty to surcharge and falsify, the *onus probandi* is always on the party having the liberty."   (2 Danl. Ch. Prac. 76; 1 Story's Eq. Ju., §525.)   This rule however, is strictly applicable to *accounts stated*, which are always conclusive upon the parties, unless some matter is shown which calls for the interposition of a Court of Equity.   The executor's accounts here asked to be re-examined do not stand as *accounts stated*.   The executor was also the guardian of the minors, and it was therefore impracticable that he could give the *notice*, which, in the matter of a settlement, is the very essence of conclusiveness.

The instruction to the Master on this point will be so framed as to require him to permit the accounts as settled by the Judge of Probate to stand, except as to the several items enumerated in the bill of complaint as matters to be "*falsified*," and as to these, the *onus* will be upon the executors, but as to the items of " *surcharge*," the complainants must assume the burthen of proof.

Let the cause be remanded, with directions to the Chancellor to conform his orders and decrees therein to the several rulings of the Court as announced in this opinion.— The costs of this appeal to be equally apportioned between the parties, plaintiffs and defendants.

BALTZELL, C. J., delivered the following opinion :

A difference of opinion prevailing upon two points in this case, I proceed to deliver the views of the majority as to them.   Under the Territorial Government, the County Courts had jurisdiction of all sums over fifty and under a thousand dollars.   They transacted the business of the county in establishing ferries, roads, &c., and, in addition, were charged with the duty of granting letters of adminis-

tration, &c., the settlement of accounts of executors, administrators and guardians. They were required to hold two terms in each and every year, and in Leon county these were directed to be "held on the third Mondays of March and September in each and every year." Duval, 287. By a special law, enacted in 1834, the Judges of this Court were required, at the first term thereof in each and every year, as soon as they shall have disposed of the civil business on the several dockets of the Court, to cause it to be proclaimed at the door of the Court House, that the Court will then be open for the settlement of the accounts of executors, administrators and guardians, and for the transaction of such other business as appertains to a Court of Ordinary; and it shall be the duty of the executors, administrators and guardians annually, at the said first day of the term, to render a full and correct account of the receipts and expenditures of all estates of which they severally may have the control, and, if approved, to be entered of record, and, on failure, were to forfeit all claims to commissions on the said amount so collected or disbursed. Duval, 188.

When the State Government was organized, the civil business of that Court was withdrawn and confided to the Circuit Court, and the county business to a Board of Commissioners. To an officer, to be called a Judge of Probate, was confided "the duty of taking probate of wills, granting letters of administration, attending to the settlement of the estates of deceased persons and minors, and to discharge the duties usually pertaining to Courts of Ordinary." Laws 1845, page 14.

The said law further enacted, "that the said Judge of Probate should have *all the powers and perform all the duties heretofore prescribed by law as the powers and duties of Judges of the County Courts* when acting as Courts of Ordinary." *Ibid.* This was in pursuance of a clause

of the Constitution directing the General Assembly to provide for the appointment of such an officer. Art. 5, sec. 9, Constitution.

Whether this law of 1834 is now in force—in other words, whether it is the duty of executors, administrators and guardians to render their accounts for approval at the first term of the Court to the Judge of Probate, on pain of forfeiture of their commissions—is the question presented for our decision. That this law and that fixing the terms of the County Courts have been, in effect, re-enacted and made part of the law of the State, does not, we think, admit of serious question. The Constitution of the State expressly declares, that "all laws and parts of laws now in force shall continue in force until, by operation of their provisions or limitations, they shall cease to be in force, or until the General Assembly shall alter or repeal the same." Sec. 1, art. 17, Sched. and Ord. Con.

Now, what part of either of these laws—that of 1834 or that fixing the terms of the County Courts—has been repealed? As to the county business, and the jurisdiction of the Court as to suits, we have seen an obvious repeal by transfer to other jurisdictions. Is there repeal in other respects as to the subject under consideration? So far from it, the powers and duties prescribed to the Judge of the County Court are specially assigned and confided to and those duties required to be performed by the Judge of Probate. Had the Judge of the County Court power to settle with administrators and others?—the Judge of Probate has the same power. Was it the duty of executors and administrators to present their accounts annually to the Judge of the County Court for approval at the first term?—it is alike their duty to present them to the Judge of Probate. In any other respect than this single one of the name of the officer, there is not a word of change, of alteration or repeal. For the Court to hold the contrary

would be to declare that the Legislature, by the law constituting the Judge of Probate, meant to say that he should not perform the duties nor have the powers prescribed by law to the Judge of the County Court, and that the provisions of the law of 1834 were annulled and repealed. It is said, however, that the fifth section of the act of 1845, to organize the Courts of Probate, whilst it fixes the place of holding the Courts, omits to state the time, and, on this account, the Judge of Probate cannot legally perform the duty enjoined upon him in this respect. If there were, in fact, an omission of this character, we are not prepared to admit this consequence by any means. It might well be a question, whether, in such event, the injunction is not to perform the act at the earliest period consistent with propriety. But there is no necessity of mooting that question here. The very section appealed to (the 5th) in support of the objection declares, that "the Judge of Probate shall hold his Courts at the places now prescribed by law for holding the County Courts." (Laws 1845.) A Judge of Probate of Leon county, then, being directed by this law to hold Courts, would naturally enquire as to the time and term of holding them. Referring to the act organizing his Court, he would see that he had the same power given to him and the same duty to perform as the Judge of the County Court. He would see, further, that it was a duty as well as the appropriate power of the County Court of Leon county to hold terms of his Court on the third Mondays of March and September in each and every year, and especially at the first term to hold a Court for the settlement of administration and guardian accounts. Under such circumstances, he could not hesitate, we think, to hold it at this time. Certainly in doing it, there would be no usurpation of power, no disobedience to or disregard of the legislative enactment, nor would any one be injured or have reason to complain. So

Moore & Montford, Ex'rs., vs. Felkel and Wife, et al.—Opinion of Court.

far from it, an eminently wise and just provision for the benefit of creditors, distributees, infants, and all others interested in the proper administration of estates, would be preserved.   At all events, the Judge of Probate would be relieved from the responsibility of its disregard and repeal. If there were doubt on the subject, we should lean to the side which preserves and maintains valuable rights and interests, which saves a statute from repeal by implication, and prevents the disorder, confusion and embarrassment which might arise from leaving this important subject without any restraint, regulation or control—far better, we think, than making another law by the Court.

If the Judges of Probate have made the mistake of not holding their Courts, about which we are not by any means satisfied, not being in possession of the practice all over the State, it is deeply to be regretted, but should not influence us to a different consideration of the subject where the question is so manifestly clear.

In matters of this kind, reference should be had for just views of the laws, to the statutes themselves in their original shape, as passed by the Legislature.   We think, then, that the administrator in this case, not having presented his accounts agreeably to law, has forfeited his commissions on the amount collected or disbursed during such period as he may have failed to render his accounts for approval.— If, indeed, an executor or administrator, having given the notice prescribed by law, had presented his accounts for settlement, and there was no Court holden, we by no means say that a forfeiture of the commissions would be induced by an act which was no default of his ; but it will be time to decide this question when it is presented.   In the case before us there was no evidence of notice of settlement, none of presentation at the time prescribed by law, none of approval by the Judge of Probate.

10

The case of Felkel and wife presents a case different from the other complainants. Defendant Moore, in his answer, sets up special facts upon which he relies as a bar to their complaint, and they are to this effect : "This defendant says that the complainants Felkel and wife, well knowing all the facts and being fully advised of all the matters which constitute their complaint, did institute an action of law against this defendant in the Circuit Court of Leon county, upon his bond as guardian of the said Elizabeth, to recover of this defendant the balance due upon his guardian account, which had been sta'ed and adjusted by the Probate Judge, and that such proceedings were had therein, that on the ——— day of ———, the said complainants, using the name of the Governor for their use, recovered the sum of $———, the penalty of the bond to be discharged by the payment of $———, the balance due, according to the judgment of the Probate Judge, by this defendant as guardian as aforesaid, and that this defendant has since fully paid and satisfied the said recovery ; that all the estate received by this defendant as guardian consisted of the balance in his hands, as executor as aforesaid, belonging to said complainant Elizabeth, which balance in his hands as executor, this defendant is advised, became immediately upon the giving of his bond as guardian, chargeable thereto. And this defendant is further advised, that the said recovery and the payment by defendant is a full satisfaction of the demands of said complainants Felkel and wife, and a bar to the relief prayed in their said bill, and he doth therefore insist upon the benefit of this defence as fully and completely in bar of the discovery and relief prayed in the bill, as if the said defence were presented by plea."

There is no difference of opinion as to the conclusiveness of the judgment as to the guardian's account. It is only as to the executor's account that the difficulty occurs. If the

account of the guardian were separate and disconnected from that of the executor, it would present a simple question easily answered. The complex position of a party occupying two relations, that of administrator and guardian, makes confusion. Responsibility is created here through the fact that in some instances what he has as guardian is derived altogether from himself as administrator; so that his account as administrator, and the balance against him as such, forms the extent of his liability, and all his liability to his ward. In other cases, there may be liability through means derived from other sources independent of or added to these.

In reference to all this, we find the law laid down to this effect : " A. was appointed the guardian of Mrs. W. when she was an infant, and the necessary consequence of this was, that the amount in his hands to which she was entitled as distributee of her mother, became so much held in trust for her as her guardian." Schnell vs. Schroder, 1 Bailey Eq., 338 ; Joyner vs. Cooper, 2 Bailey, 203.

" If an administrator have in his hands the balance of an estate and is afterwards appointed the guardian of infants entitled to it, he will be chargeable as guardian. So, if before his appointment he has received a sum of money belonging to his wards, or if in any other capacity he be indebted to himself as guardian." O'Neill vs. Herbert, Weedley Chancery, 32.

The answer, in substance a plea of defendant, would seem to have been predicated upon these authorities, as it alleges that " suit was instituted and recovery had upon his guardian bond to recover the balance due upon his guardian account," &c., which had been stated and adjusted by the Judge of Probate, and " that all the estate received by him as guardian consisted of the balance in his hands as executor." We infer from this, that what was due on the executor's account was put in issue and determined by the judg-

ment. If so, to that extent, certainly, the judgment is *prima facie* conclusive. It is difficult, however, from the state of the pleadings, to pronounce an authoritative decision on the subject. The matter set forth is appropriate to a plea, to which a replication would be necessary, according to strict chancery practice. The rules of that Court, however, abolish the replication and substitute in place of it an amendment of the bill, so as to prevent prolixity of pleading, and thereby raise the true issue. Story's Equity Pleadings, 518, §676, p. 674, §878.

Here nothing of the kind is done. The allegation remains unanswered, and the case stands before us in the situation of a bill asking relief, to which a judgment recovered is pleaded, without any reply to avoid the bar.—

That complainant may set up in avoidance matters to relieve his case from its effects, is undoubted, but they have not been presented, nor can we treat such as existing in this case.

Upon the case made out by pleadings, we are of the opinion that the Court below erred in the instruction that the judgment was not conclusive as to the executor's account, and the case will be remanded with leave to amend the pleadings in this respect, if desired, and to disallow the claim for commissions as here directed.