MARION AND MARY A. S. SANDERSON, APPELLANTS, VS. SANDERSON'S ADMINISTRATORS, APPELLEES.

SANDERSON'S ADMINISTRATORS, APPELLANTS, VS. MARION AND MARY A. S. SANDERSON, APPELLEES.

1. It is too late upon a second appeal, after hearing upon a former appeal and remanding the case, to object that an original protest of a note and certificate of a Notary are not evidence of the facts which they narrate, no such objection having been made and insisted upon at the time of their introduction in evidence.

2. Where the indorser of a promissory note resides in a different place from the point at which it is payable, notice of the default of the maker must be deposited in the post-office in time to be sent by the mail of the day succeeding the day of the dishonor of the note, provided the mail of that day be not closed at an unreasonably early hour, or before early and convenient business hours, in which case it must be sent by the next mail thereafter. Where the notice is not mailed until the second day after the dishonor of the note, and no circumstance which would extend the time is shown, it is not sufficient to bind the indorser.

3. If there has not been any due presentment and notice of dishonor of a note, and the indorser, after the maturity of the note supposing himself liable to pay it, takes security therefor from the maker, that will not alone amount to a waiver of the objection of the want of due presentment and due notice. The presumption there is that he takes the security merely as contingent security in case of his liability, but if the evidence is of such character as to show an admission of unconditional liability, and that evidence consists of such an admission to one who afterwards became the administrator of the indorser, and other circumstances, the amount of the claim so paid by the administrator should not be charged against him as a *devastavit*.

4. An administrator, under the statute, is a competent witness to declarations and admissions of the deceased intestate as to claims against him.

5. One of two partners, as attorneys at law, has a right to share in the sums realized by the other as commissions for sales of stock in a railroad company where such sales are embraced in the ordinary

usages and customs of the business of an attorney at law in the locality where it was carried on.

6. Where an administrator pays a tax to which the estate is subject, he is not to be charged as for *devastavit* on the ground that there may be some technical defect in the entry of the assessment or otherwise. Where there is an unauthorized investment of funds of the estate by the administrator, the equitable title of the distributee and the legal title of the administrator continues until the rejection of the investment by the distributee, and such investments are subject to taxation as the property of the estate until rejected.

7. Where the administrator was the partner of the deceased intestate, and has in his possession, as such surviving partner, funds collected as attorney, which are claimed by others, but in which he thinks the intestate had rights, and he is in doubt as to the party entitled, and the party on whose account the collection was made will not instruct him how to apply the money, it is proper for him to file a bill of interpleader, and when he produces the money and pays it into the court under an order of court, subject to the litigation, he is not chargeable with the sum until it is received, or may be obtained by him from the court, in the event the estate is held entitled to it.

8. Exceptions to a master's report, taken after the entry of an appeal from the order made by the court upon the report, cannot be heard.

9. The person subsequently appointed administrator of the deceased intestate finds a considerable cash deposit in a bank to the credit of the deceased. He makes a contract with the bank by which the estate was to receive interest thereon. He is properly chargeable with the sums, principal and interest, which he received under the contract.

10. The amount fixed by the Chancellor for compensation to an administrator for his services after evidence and hearing will not be disturbed in a case where this court can see no error in the sum allowed. An additional *annual* allowance for services, however, cannot be made.

11. That an administrator has made investments not authorized by the statute is no ground upon which to deny him compensation for his general services in a case where there is no loss to the estate by such investments and the administrator settles in accordance with the law controlling the matter of unauthorized investments.

12. The forfeiture incident to a simple failure of an administrator to file his returns and have them allowed and approved as required by law extends only to his commissions on amounts collected or disbursed. If the annual account of an administrator is placed in the hands of the Judge of the County Court at the time required by law, his failure to place a file mark on it does not result in a loss of commissions by the administrator. The Judge of the County Court should mark the account and vouchers filed, whether he approves them or not. If the return is not made as required by law, the administrator is entitled to no commissions. The first annual return of an administrator should embrace a period of one year commencing from the date of his letters of administration. A return is not required to be filed by the first day of June, unless between that date and the letters of administration a year has elapsed.

13. The exercise of discretion by the Chancellor in fixing the allowance by way of compensation and commissions to an administrator when within the limits fixed by law will not be disturbed by this court except where it clearly appears that the allowance is too much or not enough.

14. The surviving member of a firm uses an account of the firm, supposed to have accrued before the death of the deceased partner, against one of their clients in a transaction with such client by which he, the survivor, makes the claim available and uses it. Upon an accounting between the heirs and distributees the surviving partner is properly chargeable with such claim as an asset of the firm, notwithstanding the party allowing the claim swears no such sum was due. This in a case where the party thus settling the account waived, at the time, all right he may have had to recover the amount from the firm or any member thereof.

15. A surviving partner cannot object that interest upon a balance found due by him upon an accounting before a master between him and the heirs and distributees of the deceased partner, is allowed from the date the amount is ascertained, and the balance struck by the master.

16. Where the conclusion from the testimony is that an administrator could have readily collected a balance due the estate upon a judgment with the use of that reasonable diligence and care that a prudent man exercised in his own affairs, the administrator should be charged with it. Shepard's Heirs vs. Shepard's Administrator, 19 Fla., 300, cited and approved.

17. The administrator set up as a ground of appeal, that he is charged "compound interest on money not actually reduced to possession," and fails to show any particular item or charge in which this has been done. It is not the duty of this court to look through several volumes of a record in search for illegal charges of any kind for either party, when they are not pointed out. Such grounds of appeal are to be regarded as "frivolous."

18. Because there is no guardian of an infant appointed is no reason why funds in the hands of an administrator in which she has an interest is not to bear interest under the statute during the administration.

19. An exception to the effect that there is error in the balance found against the defendant, and on the final accounting, no items being mentioned, is frivolous.

20. Upon a previous appeal in the judgment of this court there was assessed as costs the sum of $20.75 for a "certified copy of the opinion to the Circuit Court." A sum paid by either of the parties for an additional copy of the opinion for their use, is not properly chargeable in the costs of the suit.

21. Costs incurred in the Circuit Court after the entry of the appeal, such as a charge for certified copy of the record of the decree appealed from, are taxable in this court and not in the Circuit Court.

22. A demurrer interposed in the Circuit Court is overruled. There is no question of the equity of the bill. Upon appeal this court discovers that an infant plaintiff was not preperly before the court; that the widow of the deceased intestate was suing in a right which did not exist, and had omitted to make certain allegations. Upon remanding the cause this court directed that an amendment be allowed. The defendant as to costs under these circumstances should stand in no better position than if he had set up the grounds in his demurrer, and the court should have sustained his demurrer. Costs of the amendment and no more should have been allowed. This was the extent of the additional cost incurred and no more under the usual practice was permissible.

23. Where the suit is by distributees for an account at the hands of the administrator, who is also a debtor to the estate as surviving partner in a partnership of which the deceased intestate was the other member, and the distributees in said suit claim and re-

cover a balance against him as surviving partner, neither the estate nor the interest of any distributee should be charged with any costs incurred in connection with the accounting as surviving partner, where the claim is resisted by the surviving partner after a failure by him to render an account of partnership transactions. Here the surviving partner has no claim to costs, either as between party and party or as between attorney and client. As to the matter of the suit for distribution notwithstanding the disallowance of some of the claims of the administrator, and notwithstanding the fact that upon an accounting he is found indebted to the distributees, he is entitled to his costs as between party and party, and also to any reasonable charge which he has incurred for attorney's fees, in the matter of his accounting and settlement as administrator in a case where he has acted in good faith without fraud, and his administration is followed by a full and fair settlement, and where from the positions assumed by the distributees he was forced to submit to litigation in order to arrive at any fair settlement.

24. An adult distributee is not responsible for all the costs incurred in a suit for the settlement of an estate in which a minor is a co-distributee. If not paid from the estate a portion of the costs would go against the next friend. Here a proportionate share should be charged against the part of the funds coming to the infant, as the suit is in good faith and for her interest by the next friend.

Appeal from the Circuit Court for Duval county.

The facts of the case are stated in the opinion.

*H. Bisbee, Jr.*, for Marion and Mary A. S. Sanderson.

*Fleming & Daniel* and *John T. Walker* for the Administrators.

Mr. Justice Westcott delivered the opinion of the court.

This case is here upon appeals by plaintiffs and defendants from the action of the Circuit Court had subsequent to a determination of a prior appeal by each of the parties,

and the remanding of the cause. A full statement of the case, and the action of this court upon those appeals up to the remanding of the cause, will be found in a previous volume of the reports of the decisions of this court. Sanderson's Admr's. vs. Marion H. Sanderson, 17 Fla., 820; and it is not deemed necessary here to encumber the reports with a second statement. After this case was remanded the parties entered into the following agreement:

*First.* That the testimony taken before the master, J. H. Durkee, with exhibits, shall be admitted for the purpose of the further hearing, reserving to the complainants the right to insist on the law of *res adjudicata* as to all of the accounts or any part thereof, and to the defendants the right to introduce new and further testimony as to any of the issues of fact involved. It being understood, however, 'that in case the defendants introduce new testimony, the complainants shall have the right to introduce testimony on their part in rebuttal.

*Second.* This head of the agreement refers to the method of general accounting and does not concern the exceptions brought here upon these appeals.

*Third.* The complainants agree not to dispute, but will admit all credits claimed by defendant, L'Engle, in his accounts as administrator paid on account of said estate, excepting only the Baxter claim, and such as arise from the investments of the assets of said estate other than those which have been accepted by the complainant, Marion H. Sanderson, on account of her distributive interest in said estate, except also any matter of law which may arise upon the voucher $2,064.00 paid to R. S. Grant & Co. or R. S. Grant.

*Fourth.* The following points are designated for further examination before the master:

1st. The Ambler interest account.

2d. The allowance to the administrators severally for and on account of the administration of said estate.

3d. The attorney's fees paid and to be paid by the administrators and each of them.

4th. The costs and disbursements of every kind in this suit.

5th. The item on partnership account of $4,166.66, entered as June 30, 1871, appearing on page 75 of Exhibit No. 43, as reported by the master, J. H. Durkee.

6th. The question of commissions received by John P. Sanderson for the sale of Tallahassee Railroad stock belonging to Call, Baker and Niblack in relation to the rule laid down by the Supreme Court.

*Fifth.* Errors and omissions of fact, when discovered and pointed out by either party, shall be subject to correction.

*Sixth.* Notwithstanding the foregoing points of agreement each party reserves the right to urge any and all matters of law which may be necessary to the proper presentation of the case.

An examination of the opinion rendered upon the previous appeals in this case will show that many of the matters therein considered and determined with reference to the record then before this court are under this agreement made the subject of rehearing and re-investigation by the Circuit Court and are now here to be re-investigated by us. This objection has been made here by neither of the parties and silence by all of them was the response to repeated questions by the court calling their attention to the matter. We shall, therefore, treat this agreement as the rule determining the extent to which these second appeals bring the various questions discussed to our attention. Upon the general subject of the extent to which a case is to be reviewed upon a second appeal or writ of error, see Tyler vs.

Magwire, 17 Wall., 283; Roberts vs. Cooper, 20 How., 481; Corning vs. Troy Iron Factory, 15 ib., 466 ; Ex parte Sibbald, 12 Pet., 492 ; Martin vs. Hunter's Lessees, 1 Wheat., 355 ; Himly vs. Rose, 5 Cranch, 317 ; Rœmer vs. Simon et al., 91 U. S., 149 ; Russell vs. Southard, 12 How., 159; Carter vs. The American and Ocean Insurance Company, 3 Pet., 319.   The principles clearly announced in these cases may not perhaps be applicable to the present case, because, as we said in the preceding appeals, the strict rule required their dismissal without prejudice, and the infant not being a party or concluded thereby, was expressly given the right to introduce new testimony upon all subjects and to contest all matters involved therein.   The right in which the widow sued also was of such character as gave her no equity.   She sued as heir when her only claim was as widow electing a child's part.   We accept, therefore, this agreement as the law of the case to the extent that the subsequent proceedings come within its terms.

We first consider the several grounds upon which a reversal of the decree is sought by the plaintiffs in the Circuit Court, the widow and child of John P. Sanderson.

The first ground of appeal by plaintiffs is because the Circuit Court allowed a credit of four hundred and fifty-three dollars and fifty-five cents, amount paid in settlement of the Baxter claim.

By reference to the opinion rendered upon the former appeal it will be seen that the court allowed an exception to the credit for this sum, not because it appeared that nothing was due, but because the testimony did not establish "that the amount paid was due."   In other words, it was too indefinite to fix the amount of the debt due.   The testimony upon which the plaintiffs now insist in their argument that nothing is shown to be due the Baxter estate was that taken before the mandate in the first appeal, and

which was then considered. We shall not review our conclusion as to the result of that testimony. By reference to the opinion it will be seen that our conclusion was that it did appear that something was due but that the amount paid was due was not then established. We are entirely satisfied that that conclusion was correct. The question here now is, does the new testimony, together with that here upon the first appeal, establish the amount due to be as much or more than was paid. We think the testimony of J. J. Daniel does establish that the sum paid was due. He states substantially that after an examination of the whole matter with the papers and other proofs of the claim and its amount, he "was thoroughly satisfied" that this sum was due. In this examination "the memoranda prepared during the latter month of Colonel Sanderson's life in a partial settlement made between him and parties representing the Baxter estate," to which much of the testimony upon the previous hearing was directed, was before him. The papers then before him and from which he came to this conclusion, he states he has made diligent search and inquiry for and cannot find. Mr. Bell, who represented the Baxter claim in the negotiation, and who this witness states it is probable has possession of the memoranda referred to, the witness understands lives in Texas, but where he resides or how to reach him the witness does not know. We see no legal objection to this testimony. The plaintiffs urge none. It is the positive statement of the knowledge of a party having no interest in the claim itself, and who, if he had any interest or duty in the premises, it was against the admission of any debt, as he represented the estate as an attorney at law in the settlement. For the reasons stated we think the voucher under the agreement to introduce new testimony was properly allowed.

The second ground of appeal by plaintiffs is because the

court allowed the administrator credit for $2,064 paid by him May 30, 1874, on account of the " alleged liability" of Sanderson as an indorser of a promissory note made by the Florida, Atlantic and Gulf Central Railroad Company, September 20, 1860, payable five months after date. The ground of objection is " that there is no evidence whatever that Sanderson had notice of the protest of this note, and that therefore he never became liable as endorser."

The note is as follws:

$2,064.                    NEW YORK, September 20, 1860.

Five months after date the Florida, Atlantic and Gulf Central Railroad Company promise to pay J. P. Sanderson or order at the office of Joseph Gun, 94 Wall Street, New York, two thousand and sixty-four dollars for value received, and have pledged three thousand dollars of the Freeland bonds of said company to secure the payment of this note at maturity, numbered as follows: Nos. 1, 2, 3 and 4 of $250 each, and numbers 129 and 130 of $500 each, and numbers 101 to 110, inclusive, of $100 each. Total, $3,000. To be surrendered on payment of this note.

FLORIDA, ATLANTIC & GULF C. R. R. Co.,
By J. P. SANDERSON, President.

The note is endorsed in blank: " J. P. Sanderson."

The legal presumption is that such an endorsement was made before the note was due. This we do not understand to be denied. Before the master upon the first reference and before the first appeal herein the original protest and certificate of notice thereof were placed in evidence without objection by plaintiffs. The protest is in proper form, and while it is without date, the Notary recites that on the 23d of February, A. D. 1861, he did present the original note at the office at which it was payable and demanded payment, which was refused. Following the protest is a certificate of the Notary, who states that on the 25th of February, A.

D. 1861, due notice of the protest was served upon the endorser by depositing the same in the post-office in the City of New York, and prepaying postage thereon, said notice being addressed, J. P. Sanderson, Jacksonville, Florida.

E. M. L'Engle, the administrator, says in his testimony that he "had knowledge of the debt against J. P. Sanderson, from conversations with him, during his last illness, in which conversation he sought to make me acquainted with the general condition of his affairs. He told me of this note endorsed by him and acknowledged it as a claim against him. He spoke of the bonds which were hypothecated with the note, (Freeland bonds,) and of other bonds of the same class which had been hypothecated with one Davis in North Carolina by the Florida, Atlantic and Gulf Central R. R. Company for a debt due said Davis by the company, and which, the debt being paid, Davis had returned to him, Sanderson. He said that said bonds so returned were in his safe, and that he meant to hold on to them for his protection, which bonds so in his safe, together with the bonds which were hypothecated with said note I, as admininistrator, filed with James M. Baker, Master in Chancery in the suit of L. I. Fleming and Green H. Hunter, Trustees against the Florida, Atlantic and Gulf Central Railroad Company, to close the trust concerning all the bonds of that class. The bonds so filed by me are still with James M. Baker."

When exhibit C, which was the original protest and certificate before alluded to, and a copy of the note was originally introduced in evidence before the first appeal, L'Engle in his testimony stated that "the demand was presented for payment in the early part of February, 1872. The demand was made in writing by letters addreesed to me which I here produce and offer in evidence, contained in seven sheets of paper." Plaintiffs' attorney objected to the introduc-

tion of the papers because, as he contended, they constituted " no evidence of legal presentation of the claim referred to therein against the estate of John P. Sanderson," and also " for want of proof of their authenticity." L'Engle, after stating that Sanderson, during his last illness, sought to make him acquainted with such of his business affairs as were unsettled, says that Sanderson spoke to him about this note. The witness says : " This debt was one of the matters he talked to me about. I endeavored to effect a settlement of Sanderson's liability at a heavy discount. The negotiations extended through 1872 and 1873. I finally succeeded in effecting a compromise of the whole debt for the amount of the principal. The bonds mentioned in Mr. Grant's letters, as being placed with him as collateral security for the ($2,064) two thousand and sixty-four dollar note were delivered to me as administrator by the holder of the note through Ambler's bank. Said bonds were by me filed with James M. Baker, Master in Chancery, appointed in a proceeding instituted to close the trust under which said bonds were issued. They were filed that the estate might receive its distributive share from these bonds." The letters, to which allusion is here made, are in the record, but beyond the fact that they show confidence in the liability and solvency of the estate, it is not seen that they have any bearing upon the question raised as to this payment upon this appeal.

The note, protest and certificate must be treated as properly in evidence here, and must be given the same effect as they would be entitled to if they were accompanied by the deposition of the notary. Nicholls vs. Webb, 8 Wheat., 332; Spann vs. Baltzell, 1 Fla., 322.

No such objection was taken to them when introduced upon the first appeal, and it is too late now to urge the ground that an original protest and certificate are not evi-

dence of the facts which they narrate. It appears here, therefore, that this note was presented for payment and payment demanded and protest made on the 23d of February, A. D. 1861, and that notice of such demand and dishonor was mailed to Sanderson, the indorser, on the 25th of February, A. D. 1861. The question which the plaintiffs raise here now, is whether upon these facts, the indorser, Sanderson, was bound, and this is a question of law, which under the third stipulation of the agreement, they have a clear right to raise and insist upon. The indorser here resided in Jacksonville. The note was payable in New York City.

Chief-Justice Marshall, in Lenox vs. Roberts, 2 Wheaton, 373, says it is the opinion of the court that notice of the default of the maker should be put into the postoffice early enough to be sent by the mail of the day succeeding the last day of grace. In the case of the Bank of Alexandria vs. Swann, 9 Pet., 33, Mr. Justice Thompson approved of the general rule announced in Lenox vs. Roberts. The same rule was adopted by Mr. Justice Washington in the case of the United States vs. Parker's Admr's., 4 Wash., 465, and that decision was affirmed on error by the Supreme Court in 12 Wheat., 559.

It is unnecessary to repeat authorities to this general proposition. The rule where the indorser resides in another State or place is, that the notice must be deposited in the postoffice in time to be sent by the mail of the day succeeding the day of the dishonor provided the mail of that day be not closed at an unreasonably early hour or before early and convenient business hours in which case it must be sent by the next mail thereafter. "In other words," as remarked by Mr. Daniel, " the notice must be sent by the first mail which leaves after the day of dishonor is past and does not close before early and convenient busi-

ness hours of the day succeeding the day of dishonor." See the case of Lawrence vs. Farmer's Bank, 1 Ohio State, 206, a case which this able text writer justly calls "a most learned and instructive case on the subject of notice."

In this case the notice was not mailed until the second day after the dishonor of the note. No circumstance extending the time to that day is shown. The notice therefore was not sufficient to bind the indorser.

It is insisted, however, that the indorser here received security and indemnity of such character and from such party as excuses notice by the holder of the demand and dishonor. We do not think that the facts of this case call for a discussion of this doctrine. As indorser, Sanderson had nothing in his hands to secure him against his contract as indorser. The bonds which went to the holder of the note, his indorsee, were for his, the holder's, security. They were not in the possession of Sanderson to secure him as indorser, and L'Engle, Sanderson's administrator, received them from the agent of the holder, when he paid the principal of the note. The bonds were received by L'Engle, the administrator, after maturity of the note and its dishonor and after Sanderson's death. The indorser here never did have them as security for his contract as indorser. As to the other bonds of which the indorser spoke in his conversation with L'Engle the time or circumstances under which he, Sanderson, received them, so far as disclosed, would give him no right by virtue of any contract shown, to hold them as indemnity. He states that they were hypothecated " with one Davis, in North Carolina, by the Florida, Atlantic and Gulf Central Railroad Company for a debt due said Davis by the company, and which (the debt) being paid, Davis had returned to him, Sanderson. He said that said bonds so returned were in his safe and that he meant to hold on to them for his protection." This

does not prove any possession of these bonds by Sanderson under a contract made with him as indorser by any party to secure him. In his last illness he simply states that these bonds are in his safe. He received them from Davis when the company paid Davis what it owed him. Sanderson had possession of the bonds, and affirmed that he would hold them for his protection, and we think the presumption here is that Sanderson received these bonds after the dishonor of the note by virtue of some understanding with the company. What that understanding was, however, as far as it affected the nature of the liability of Sanderson is concerned, is not disclosed. The rule as stated by Mr. Justice Story upon this subject is that " if there has not been any due presentment and notice of dishonor of the note and the indorser, after the maturing of the note, supposing himself liable to pay the same, takes security therefor from the maker, that will not alone amount to a waiver of the objection of the want of due presentment and due notice, since it cannot justly be inferred that he means at all events to make himself liable for the payment of the note; but he takes the security merely as contingent security in case of his liability." Story on Promissory Notes, 278. Here there is no proof that Sanderson took these bonds under any contract with the maker of the note, and so far as the act of Sanderson's administrator was concerned he simply received the bonds from the holder of the note (Sanderson's indorsee) when he, the administrator, paid the note. See also upon this subject 2 Daniel Negotiable Instruments, second edition, pages 164, 165, 166, 167, 168.

If, however, it be true that the Davis bonds were placed in Sanderson's hands under a contract of indemnity with the company before the note became due, after indorsement and before dishonor, the simple fact of receiving such security unaccompanied by other circumstances which indicate an

intention of the indorser to dispense with demand and notice would not excuse notice. An indorser's contract is one of contingent liability. To make it absolute the circumstances must show such to be the intention and the taking of security as shown in this case is not sufficient to change the nature of the liability from conditional to absolute. Kramer vs. Sandford, 4 Watts & Sargeant, 328. Where, however, it is distinctly shown that the indorser, with knowledge of the facts attending the protest and notice, and with knowledge as in this case that he had received no sufficient notice to bind him as indorser, takes a security, "it is a circumstance of evidence to show a waiver of objection, though not conclusive or perhaps even presumptive proof of that fact." 2 Daniel Negotiable Instruments, 166. For, as remarked by an able text writer, (1 Parson's N. & B.. 619) " why should a person take these steps to secure himself unless his liability actually existed." This brings us to the consideration of the proposition of the administrator here that Sanderson acknowledged the debt, and with a full knowledge of all the facts directed its payment as his debt, and did such acts as amount to a waiver of the objection that the proper steps had not been taken to bind him as indorser. We cannot presume that an attorney connected with such varied and important commercial transactions as this record shows Sanderson was, was not aware that under the law the notice here was insufficient to bind him. But whether he knew this to be the law or not is not material. He received the protest and notice and had actual knowledge of the facts concerning them. Want of actual knowledge of the law in this as in many other cases is no excuse. Whether he knew that this fact constituted a legal defence to the note is not material. Third National Bank of Boston vs. Ashworth *et al.*, 105 Mass., 503 ; Hughes vs. Bowen, 15 Iowa, 446 ; Richter vs. Selin, 8

Sergt. & Rawle, 425 ; Kennon vs. McRea, 7 Port., 175 ; Tibbets vs. Dowd, 23 Wend., 386. We think that the admissions and directions of Sanderson to L'Engle in respect to this note are inconsistent with any other theory than that Sanderson acknowledged that he was legally bound to pay the note. He spoke of it as a debt and gave directions which are consistent only with an admitted liability, and that liability could not have been such as resulted from notice of demand and dishonor. He knew the facts as to the nature of the demand and the character of notice he received, and was chargeable with knowledge that the law applicable to such facts was that he was excused. He had full knowledge of the laches. This admission and direction to L'Engle was made, too, under circumstances of more than usual solemnity. It was during Sanderson's "last illness." "This debt was one of the matters he talked to me about," says L'Engle in his first examination, and in the examination since the case was remanded, he says "that Sanderson acknowledged it as a claim against him," and advised him, L'Engle, that he (Sanderson) held certain bonds for his protection. The cases upon this subject are collected in 2 Daniel on Negotiable Instruments, pages 186, 187 and 188. These acts and declarations to L'Engle were of such character as to show that Sanderson admitted his liability here, and we think the law justified his acting upon such declarations and acts. Certainly as to L'Engle any party claiming through Sanderson should be estopped from denying the liability which Sanderson admitted to him. It may be insisted that there is here no direct evidence of any admission of liability or promise to pay *to the holder* of this note by Sanderson. This is true. But his admissions to L'Engle are only consistent with such admitted liability to such holder. If it is established that Sanderson during his lifetime admitted his liability for

this claim to the person who became subsequently his administrator, we think the administrator is not called upon to resist it, for the necessary presumption is that the holder of the claim is entitled.

It is insisted that the length of time which elapsed during Sanderson's life should create a presumption of knowledge upon the part of the holder that some defect existed which would defeat a recovery. We must recollect that the war here intervened. And besides, the evidence when it relates to this subject shows that the delay to press Sanderson was occasioned by the expectation that he might in some way get the money from the railroad company. The holder seems to have acted under the impression that Sanderson " was a man of large means," and " he had no question but that it," (the claim) " could be collected by due course of law." The conclusion we reach here is, that the facts that Sanderson after the maturity of the note took security after his knowledge of want of due notice of demand and dishonor, and his admission and declaration after such knowledge, to L'Engle, who was then his partner and to whom he (Sanderson) was then giving directions generally as to his business and for the purpose of making L'Engle acquainted with the situation and nature of this claim, that the note was a debt for which he was liable, is sufficient to at least make a *prima facie* case of liability of the estate for this debt, upon which the administrator was authorized to act. What might be the case if the distributees here proved that Sanderson had done no act, nor made any agreement or promise to pay with his indorsee which waived want of notice of demand and dishonor which would negative such *primá facie* case (such, for instance, as evidence of the indorsee to that effect,) and that L'Engle could by reasonable diligence have ascertained this fact, we do not say. We

simply say, *prima facie* the administrator was not guilty of a *devastavit* in paying this debt under the facts in evidence here. Sanderson's acts and declarations here show that he owed the debt and there is no doubt that L'Engle, under the statute, is a competent witness in this behalf. As to whether he ought to be, that is a matter of legislative discretion which we propose not to criticise.

It is not necessary in this case to decide the question, but we are inclined to the view that Sanderson here was not entitled to any notice; that he was so chargeable in law with knowledge of demand and dishonor that he was not entitled to notice. The demand for payment here was at the time and place appointed in the note and by a party entitled to payment. It was good against the company. Sanderson, here the indorser, was the representative of the company, and as its president drew the note. He was the president of the company when it became due. (We have not examined the record carefully as to this fact, as the decision is not controlled by our views based upon it). He was the payee of the note and was a director and a stockholder in the corporation. A corporation has only an artificial existence. Its acts, its knowledge, its resposibilities, the exercise of its powers and the discharge of its duties result from the acts and knowledge of its representatives, who are natural persons, and we think if the demand here was legal and proper, and of that there is no doubt, that Sanderson, by virtue of the relations stated, was chargeable with knowledge of demand and dishonor, and that that knowledge being derived from act of a party entitled to payment, excused any further notice to him. If Sanderson was chargeable with knowledge as such officer and representative of the corporation it would bind him individually as endorser. In the case of Caunt vs. Thompson, 62 Eng. Com. Law, 400, " at the trial, it was proved that the

bill was presented on the day it became due, at the house of the acceptor; and the defendant, to whom it was then shown, said that the acceptor was dead, and that he was his executor, adding a request that it might be allowed to stand for a few days, and he would see it paid." The executor was the drawer of the bill, and it was held " that there was sufficient evidence of notice of dishonor," and that "knowledge that the bill has been dishonored where the drawer is himself the party who is to pay the bill (as executor of the acceptor), amounts to notice." As a matter of course the knowledge in this case was derived from a person entitled to payment. So in the case now before the court, the demand was made by the agent of the indorsee of Sanderson, who had the right to demand payment of the company.

The third ground of appeal by plaintiffs, is because of the allowance of a charge against intestate, Sanderson, of $1,200 in the account between him and respondent, E. M. L'Engle, as surviving partner of the firm of Sanderson & L'Engle, received by the intestate as commissions for the sale of stock of the Jacksonville, Pensacola and Mobile Railroad Company from Messrs. Call, Niblack and Baker.

When this case was here upon the former appeal we held that this sale of stocks was the business of a broker; that it did not belong to the ordinary business of attorneys at law, and that in the absence of proof of an express contract, making such sales a part of the business of the firm as attorneys, or that such acts were embraced in the ordinary usages and customs of this business in the locality where it was carried on, or that this transaction was one which the firm was employed to effect, or that the ordinary exigencies and objects of the partnership embraced sales of stock, L'Engle was not entitled to a share in the commissions paid. 17 Fla., 845. The matter is now presented

with additional testimony and it is insisted that the proof
sustains the proposition that such a sale of stocks was em-
braced in the ordinary usages and customs of the business
of attorneys at law in Jacksonville, Florida.   The Judge
of the Circuit Court so found. Some of the testimony here
looks to cases of special contract where such sales are had
through correspondence with a firm of attorneys.   We do
not think this reaches the question, because it is not con-
tended here that Sanderson himself proposed to be acting
as a member of the firm.   No act of the firm is shown in
connection with the matter.   The proposition is that while
Sanderson may not have supposed that his sale was as a
member of the firm and therefore did not charge himself
with it, still, that it was an act like the preparing and fil-
ing an ordinary declaration, the compensation for which
enured to the partnership by virtue of the fact that the
service was such as pertained to the business of attorneys
at law, according to the ordinary usages and customs of
their business in Jacksonville.   We have read the testi-
mony upon this subject carefully and the ruling of the court
is certainly amply sustained by the evidence.   Under these
circumstances, however strange the fact that the ordinary
business of an attorney embraces in the locality a simple
sale of stock, an act which clearly belongs to the avocation
of a broker, may appear to us, still, under the rules con-
trolling this court in the contingency presented, we are
obliged to affirm the ruling.

The fourth ground of appeal by plaintiffs is because
sums paid for taxes on the property of the estate from 1875
to 1880 were allowed the administrator.   The first objec-
tion to the allowance is because he was not assessed for the
" personal property held by him in such representative ca-
pacity, his representative capacity being placed opposite
his name."   The assessment here was entered: Sanderson,

J. P., Est.   There are cases which hold that a Collector could not maintain an action against the administrator of an estate for the amount of the tax on personal property assessed to " the estate of " the deceased after the date of an administrator's appointment.  They have no application here.  An administrator cannot be charged either in a court of equity or law with a *devastavit* for the payment of taxes to which the property of the estate in his hands or under his control was subject.  The only question which the distributee can here ask is, was the property subject to taxation, and did you by your payment discharge a tax to which it was subject?  The administrator is no more obliged to take advantage of an assessment of personal property illegal in the manner here disclosed where such property exists and is subject to the tax than an individual is.  We do not propose to follow the argument of plaintiffs when they deny that the estate had personal property to the extent to which the administrator paid the tax.  It is enough to say that personal property of the estate to the amount for which the tax was paid had come to the hands of the administrator, and that it was then in his hands and that such moneys or personal property were subject to the tax.  The position that the act of illegal investment without the dissent of the distributee changed the nature of the asset to a claim against L'Engle amounts to nothing, for if it be correct, which it is not, then the claim against L'Engle, itself was subject to tax as the property of the estate.  The administrator here, however, had a right to treat the securities in his hands as the property of the estate.  It is nowhere shown that his purpose was to convert them to his own use, nor were they in contemplation of law his property until the distributee rejected the investment.  The equitable right of the distributee to the funds invested and the

legal title of L'Engle as administrator existed until the distributee rejected the investment.

As we understand the fifteenth ground of appeal of plaintiffs, which is an order for the payment of the taxes on assessment of $20,000 of personal property of the estate for the assessment of 1881, what has been said covers the question involved, and for the reasons stated we think it correct.

The fifth, sixth, seventh, eighth, ninth, twelfth, thirteenth and fourteenth grounds of appeal by plaintiffs relate to costs of the suit and allowance to the administrator for his services. Their consideration is postponed until other matters not involving so general a discussion of the nature of the case are disposed of.

The tenth ground of appeal of plaintiffs is because L'Engle, the administrator, is not charged with moneys which plaintiffs allege he had collected on a claim of the estate against the firm of Smallwood, Hodgkiss & Co. Upon these moneys plaintiffs claim compound interest from the time that the moneys came into L'Engle's hands as administrator.

The facts here are as stated by the Judge of the Circuit Court. These moneys were moneys collected by L'Engle as surviving partner of the firm of Sanderson & L'Engle upon a claim of J. L. Smallwood or Smallwood, Hodgkiss & Co. against Thomas Livingston & Co. The funds were in his hands as attorney and surviving partner of the law firm. His clients, although frequently requested to give him instructions as to the application of the funds, declined to do so. Other creditors of his clients were insisting that they had a better right to all or to a part of the funds than Sanderson's administrators had. L'Engle himself was not familiar with all the facts concerning the transactions between Sanderson and Smallwood. For his pro-

tection he files a bill of interpleader, produces the money and it is placed in a bank in Jacksonville by order of the court to abide a determination of the pending interpleader suit. The claim of the estate was sustained. The plaintiffs, the distributees, are entitled to the money. It is in the registry of the court and should be thus applied. During the pendency of the suit and before L'Engle has possession he is not chargeable with it or interest upon it unless he neglects to collect it for an unreasonable length of time and it is lost. So far as the estate is concerned the record does not disclose that this money was ever in L'Engle's hands as administrator, and it does disclose that before the claim of Sanderson against Smallwood, Hodgkiss & Co. came to L'Engle's hands, such firm was so notoriously insolvent that it would not give any direction as to an application of its assets, but left L'Engle not only to protect the estate, but to contend with all the other creditors of the estate. Again, how can L'Engle be charged with the debt as if lost, when the court has decided that the estate is entitled to the fund now in its registry.

So far as the matter of charging compound interest upon this claim is concerned, this court has frequently held that an administrator is only chargeable with such compound interest upon *moneys received* and L'Engle *has not received* anything here as administrator. There is no claim on account of unreasonable delay in collection after judgment of the court. So far as the objections to the allowances for costs in the interpleader suit is concerned we cannot collaterally question the judgment in that case. These allowances are directed by the court in that suit to be paid from a fund in its own custody. The administrator, however, is the party to act and to place the money subject to the orders of the court in this case or he will be responsible for delay.

The next ground of appeal of plaintiffs, which does not concern general costs of the case and the allowances to the administrator, is the sixteenth, which is an order of the court directing the master to take testimony and report the amount due F. F. L'Engle for professional services rendered the administrators. The ground upon which the exception is based is that a creditor and an administrator cannot thus settle their differences in this case, which is a suit by heirs and distributees for an account and distribution; that the creditor should bring his independent suit at law, or the administrator pay the amount due and ask credit for the voucher.

Upon an examination of the record we find that the exception taken to the master's report upon the subjects embraced in this ground of appeal were taken subsequent to plaintiffs' appeal herein entered, and that the order of the court made thereon was made subsequent to the entry of appeal by the plaintiffs. The entry of the appeal here was filed May 18, 1883, and the appeal is from orders of the court made on the 29th of March, A. D. 1883, and the 17th of May, 1883, while the report of the master as to this matter was in pursuance of an order of May 28, 1881. The exceptions to this report was filed after the entry of the appeal and after the order of the court thereon was made. There are a considerable number of irregularities in this proceeding, which the court, because no objection was made, has not alluded to. This, however, cannot be overlooked as it is a matter of jurisdiction. No appeal in this case brings the matter of the action of the court upon these exceptions to our attention. What has been said embraces all the grounds of appeal urged by plaintiffs, except those referring to costs and allowances, which we consider hereafter.

We now examine the grounds of appeal by defendants.

The first ground alleged is charging the administrator, L'Engle, with any part of the interest on the amount deposited at Ambler's bank up to the time of his administration.

What are the facts? Sanderson died intestate about the 29th of June, 1871, leaving a considerable cash deposit in Ambler's bank. L'Engle was appointed administrator of Sanderson's estate on the 7th of November, 1871. Before his appointment, but in anticipation of it, he made a contract with the banker by which the banker agreed to pay interest on the moneys belonging to the estate which were then in his hands, or which should afterwards come to his hands, on condition that L'Engle would leave the funds there " during the winter, or the greater portion of it of 1871–2," or for such time as he should want such funds, not extending beyond such winter. L'Engle, under the contract, was to have the right " to withdraw the funds as the necessities of the estate might demand and in such sums as might be necessary." On the 5th of March, 1872, L'Engle, in his account with the bank, is credited for interest to July 1, 1871, $89.44. · This interest accrued anterior to L'Engle's contract. On the same date he is given a credit for interest from July 1, 1871, to date of entry, March 5, 1872, for $1,968. L'Engle's first return extending from the date of his letters, November 7, 1871, to May 31, 1872, (a period of less than seven months) has no reference to the credit for this interest in his account with his depositary, the banker. In his account from the first of June, 1872, to and including May 31st, 1873, he charges himself with it as of the date of June 6, 1872. L'Engle has filed in this case a statement of his investments or loans of the funds of the estate in which the amount left on deposit with Ambler is not treated by him as an investment or loan of money. It

is not pretended that any part of the sum left on deposit, principal or interest, was lost. The moneys remained with the banker to the credit of the administrator and were drawn out for investment or disbursement at the discretion of the administrator. The Judge of the Circuit Court directed that the administrator be charged with the amount he realized for interest, $1,968. If we understand the matter, the administrator insists that his transaction with the banker constituted an unauthorized investment of the money; that it was similar to a loan of money of the estate upon a mortgage not approved by the court, and that he was not chargeable with the interest credited to him by the bank. He insists further that he is chargeable with no interest upon the deposit during the time this interest accrued. Even if this is to be treated as an unauthorized loan, the administrator should be charged with some interest at least. We do not see, therefore, any foundation at all for the position that he is chargeable with *no interest* on the money. But we think it clear that this is not an unauthorized investment or loan for which the administrator is chargeable. In the first place, even if it be a loan, the administrator's account with the banker shows no loss. It shows that it has been paid by the banker. It was the money left by the intestate on deposit in the bank against which the administrator drew, in the general management of the estate. If an unauthorized investment is made during an administration and such investment is satisfied by payment, principal and interest, to the administrator, it ceases to be an investment and becomes moneys of the estate, realized from such investment, and the administrator is thus chargeable if the distributee so desires. As a matter of course, there may be circumstances connected with the investment or loan of the fund which would give the parties interested as distributees a right to object

to the whole transaction and claim more than what was realized from the use of the fund. Here, however, there is no loss. The money resulting from the contract has been realized ; there is no existing investment or security to be rejected ; no objection by distributees ; and hence the fact of "risk," or the extent or nature of the "risk," which the administrator insists he assumed by leaving the money on deposit, are entirely immaterial.

The second ground of appeal of defendants. The Chancellor allowed L'Engle $4,000 compensation for his services as administrator. The administrator objects to this allowance, and claims six thousand dollars. This sum was fixed by the Chancellor after hearing evidence as to the character of the services, and as to what would be a fair compensation. We have read the testimony and cannot say that there is any error in the action of the Chancellor. In this connection it is proper to refer to the objection that the administrator in this case invested the moneys of the estate in personal securities and where there was a mortgage security taken it was not approved by the Judge of the County Court. The result under the statute, as to this money, is simply that the administrator is chargeable as we have stated upon the former appeal. We do not understand the statute to provide for any forfeiture except in the case of the neglect of the administrator " to render " his annual account to the County Court, and the forfeiture there does not extend beyond commissions on amounts collected or disbursed and approved and allowed. In this case the administrator has been held to a strict account for all the moneys which came to his hands, as the statute required. If a distributee, upon the rejection of investments not authorized by law, but made in good faith by an administrator, succeeds upon a simple accounting in a master's office in recovering all that he is entitled to with compound in-

terest at eight *per cent. per annum*, we think he has no cause to complain, and that the administrator should be allowed, in the language of the statute, " a fair and just compensation " for his services not embraced in the terms, commissions on amounts collected or disbursed, or under the heads of compensation. The evidence discloses that settlements very favorable to the estate were made of claims due by the estate. His accounts, while they were not marked filed, were in the office where the law required them to be. All the information which the distributees could obtain with the file mark on them they could obtain from them without the file mark. There is no loss. For this care, attention and mangement he is entitled to compensation. This allowance, however, embraces all that should be allowed to the administrator for care and attention. Any allowance made as an annual allowance, so far as plaintiffs have excepted, should be disallowed, as the statute does not authorize both.

The defendant's third ground of appeal relates to a charge against L'Engle for attorney's fees in this suit. Its consideration is postponed until we reach the general subject of costs.

The next grou d of appeal, the fourth, of defendant is because the master failed to credit the administrator with interest " on payments and disbursements." We do not think that the administrator is entitled to commissions on moneys collected or disbursed in this case. Such commissions are to be allowed only on returns made as required by law. Moore and Montford vs. Felkel and wife, 7 Fla., 73, and then they are restricted to accounts embraced therein for amounts collected or disbursed to the extent that they are approved by the Judge of the County Court. Thomp. Dig., 207, Chap. 1013, Laws; McC. Dig., 97 and 98. This forfeiture, however, does not embrace "compensation"

on money arising from the sale of personal property or land authorized by the statute. Under the decision of Moore and Montford vs. Felkel, 7 Fla., 63, 64 and 73, I understand the forfeiture under the statute extends only to commissions on amounts *collected* or *disbursed* and does not embrace "compensation" for sums realized from the sale of personal property or land or allowances for "care and attention to, and management of the property of the estate from year to year." Thomp. Dig., 207 and 208; McC. Dig., 98; Moore and Montford vs. Felkel and wife, 7 Fla., 63, 64, 73. We have several times alluded to the "annual returns" of an administrator, and "the returns made as required by law." While no objection is made here by either party to the date of the returns made by the administrator here, still the question of the forfeiture of the commissions on amounts collected or disbursed depends in part upon whether these returns are annual in the meaning of the statute and made at the time required by law, as if not so made this commission is forfeited. In this case the intestate died about the 29th of June, 1871, the administrator was appointed on the 7th of November, 1871, and his first return includes and ends with the 31st of May, 1872. This return is made eleven months after the death of the intestate, and six months and some days after the qualification of the administrator. It is, therefore, in no sense an annual return, unless the beginning of the year is to be fixed before the death of the intestate. This, we presume, no one will contend for. Under the act of 1859, Chapter 1013, Laws, it is provided that "administrators * * may make their *annual* returns at any time before the first day of June in each and every year." This statute should not be so construed as to repeal that portion of the law which requires *annual* returns when its language does not require such construction, and when

21

looking to the almost uniform policy of all the other States an administrator's first return commences from the time of *his appointment* and extends for such length of time as will enable him to get the estate in hand and make some comprehensive and full return of its condition, its liabilities and its assets. 3 Williams on Executors, 6 Amer. Ed., b. p. 1845 and 1846. Suppose the death of the intestate occurs on the 30th of April, does the law contemplate a monthly return for May? Is this an annual return within the meaning of the law? Again, the law does not provide that the fiscal year for administrators' accounts shall end on and with the thirty-first of May. On the contrary the law in express terms provides that such "annual returns" may be made "*at any time before* the first day of June." If it can be made at "*any time*" before the first day of June, why say that it can be made to close only on the 31st of May. In this case the administrator was appointed November 7, 1871. His annual account should have embraced the period from the 7th November, 1871, to 7th November, 1872, and his return for that year was required by law to be made "at any time" between the 7th of November, 1872, and the first day of June, 1873. A return is not required to be filed by the first of June, unless between that date and the date of the letters of administration a year has elapsed so that an "annual return" can be made. It is true the words of the statute are "by the first day of June in each and every year." This means in each year in which an *annual* return can be made. No return for a part of a year is authorized unless it is the last return which may necessarily be for less than a year.

Before leaving the subject of returns and allowances by way of commissions and compensations, we wish to say generally that the exercise of discretion by the Circuit

Court upon these subjects, commissions and compensations within the fixed legal limits, should not be interfered with by an appellate tribunal except in a plain case of an allowance too large or too small approved by that court.

The next ground of appeal, the fifth, of defendant, L'Engle, is to the action of the court in not allowing L'Engle an item of $4,166.66, which he charged to himself in his partnership accounts, but for which he claims he is not liable, and that his charge was a simple gratuity. The testimony of L'Engle and Littlefield and the exhibits give the history of the transaction out of which this debit arises. L'Engle says, " as to the amount of $4,166.66, I say that between the 15th of April and the end of May, 1871, J. P. Sanderson informed me that he had made a contract for the employment of the firm of Sanderson & L'Engle and the survivor of said firm, by the Florida Central Railroad Company and the Jacksonville, Pensacola and Mobile Railroad Company for the term of three years, commencing on the 15th of April, 1871, at the compensation of $20,000 per annum, payable monthly. At his request I reduced the said agreement to writing and he signed it, but no other party signed it. Afterwards, on the 22d of May, 1871, J. P. Sanderson executed an indenture, whereby he transferred and conveyed to myself all of his interest in the capital stock and property of the Jacksonville, Pensacola and Mobile Railroad Company. The object of such indenture being to secure the carrying out of the agreement I have just testified to by M. S. Littlefield, and also to guard against the non-payment of the drafts which I have testified to as having been given on the 15th of April, 1871, it being provided in said indenture that when said drafts should be paid and when all moneys due by said railroad companies or by said M. S. Littlefield to Sanderson & L'Engle, or either member of said firm, shall be fully paid and satisfied, that then I

should assign and convey to M. S. Littlefield, or to his orders, all of the said shares of capital stock and interest in said railroad. Subsequently, on the 15th of February, A. D. 1872, I made a contract with M. S. Littlefield cancelling all engagements for professional services. I had received no payment under the contract which I have testified to as having been signed by J. P. Sanderson. I mean the memorandum of a contract which he had told me he had made, and no compensation whatever for services rendered said railroad companies or M. S. Littlefield since the 15th of April, 1871. *In cancelling my engagements with Littlefield and said companies I did not feel at liberty to give up the amount which he and the railroad companies were due to the firm of Sanderson & L'Engle, nor to cancel any engagement which had existed so far as the firm was concerned without indemnifying the firm for the claim so surrendered, therefore assuming that the memorandum of a contract given me by J. P. Sanderson was correct, and without inquiry whether or not it was correct, I charged myself with $4,166.66, that being the proportionate amount of $20,000 a year for the time the firm of Sanderson & L'Engle continued after the 15th of April, 1871. J. P. Sanderson lived two months and a half after the 5th day of April, A. D. 1871, and I charged myself with the amount that would have belonged to the firm under the memorandum of contract referred to if the payments had been actually made and received by me.*" (Italics are by the court.) "That amount being assumed by me I felt at liberty under the indenture of the 22d of January, 1871, above referred to, to make the contract I did make with M. S. Littlefield, above referred to, dated 16th of February, 1872. I have never received any money under the contract, a memorandum of which, signed by J. P. Sanderson, I have above referred to, nor under the contract of 16th of February, 1872, with M. S. Littlefield,

above referred to, but as I have stated I became responsible for and assumed all that the firm of Sanderson & L'Engle would have been entitled to under any circumstances, and in my accounts and dealings with the firm's business treated myself as having received the said sum of $4,166.66 in money. The shares of capital stock in the Jacksonville, Pensacola and Mobile Railroad Company mentioned in the indenture of J. P. Sanderson to myself, dated May 22d, 1871, were four thousand shares in said railroad company. The contract above referred to between M. S. Littlefield and myself, dated February 16th, 1872, which contemplated a transfer to him of the said shares of stock in consideration of an abandonment of my interest as a survivor in any contract for professional services and for the other consideration stated in said contract, was not carried out and performed on the part of Littlefield. I have the four thousand shares of stock still, and will very cheerfully turn them into the estate of J. P. Sanderson in consideration of the amount I have charged myself, as above stated. I mean that if I am repaid the $4,166.66 I have charged myself with on the firm books I will gladly assign the certificate of said stock. Said certificate and stock were among those, all of M. S. Littlefield's interests in which were sold under the proceeding in chancery I have above testified to. As a result of said sale whatever equity M. S. Littlefield may have had in said stock was extinguished and I hold and control them and am willing to transfer them as I have above offered to do. I had no personal knowledge of the terms of contract memorandum of which, signed by J. P. Sanderson, I have above testified concerning; I mean that I had no knowledge other than that derived from J. P. Sanderson until after Sanderson's death, when M. S. Littlefield informed me that the memorandum of contract was correct except as

to the amount of compensation. He stated that the amount should have been stated in said memorandum at fifteen thousand dollars." It is thus seen that according to L'Engle's understanding, there was due under the contract of April 15, 1871, to Sanderson & L'Engle, at Sanderson's death, this sum of $4,166.66. This indebtedness it is seen was a part of the consideration of the contract of February 16, 1872, between Littlefield and L'Engle, enuring from L'Engle to Littlefield. This contract upon its face, (the contract of February 16, 1872,) shows its purpose to be to close all the matters existing between the parties. This is L'Engle's view of the matter. What does Littlefield say of this contract of the 16th of February, 1872? He says: " The contract of the 16th day of February, A. D. 1872, between E. M. L'Engle and myself, was a full, final settlement of all matters between myself and the railroad companies on the one part, and E. M. L'Engle and Sanderson & L'Engle on the other part, and of all and of every contract between us. This of course includes the contract of April 15th, 1871," (the contract under which the $4,166.66 enured to Sanderson & L'Engle, and with which L'Engle charged himself or credited the firm,) "and of all moneys due under it." In the contract of February 16, 1872, there was this covenant: " It is further understood and agreed that no claim or demand shall ever be made by the said Littlefield, or the said Swepson," (whose agent Littlefield was,) " or by any of the said railroad corporations, or by any creditor thereof, or by any stockholder therein against the said Sanderson & L'Engle, or the survivor thereof, or against the legal representatives of the said J. P. Sanderson," (one of whose administrators the said E. M. L'Engle is,) " for any money so received by the said J. P. Sanderson in his life time, or by his legal representatives after his death, or by the said Sanderson & L'En-

gle, or the survivor thereof." Littlefield says this contract
was inserted at the instance of L'Engle, and while Little-
field, in his testimony, restricts its operation to a payment
of $15,000 made to Sanderson in his life time, which
sum Littlefield did not owe, and which Sanderson refused
to account for except as a sum to be credited for future ser-
vices by Sanderson & L'Engle, still it is apparent upon the
face of the instrument that the covenant covers "any
money" received by Sanderson in his life time, by his legal
representatives after his death, or by Sanderson & L'Engle,
or the survivor thereof, and while the terms of the cove-
nant are restricted to "money," still to give it any effect
as to the survivor, L'Engle, it must embrace any money
due by Littlefield to Sanderson & L'Engle up to Sander-
son's death, and which, according to the testimony of both
L'Engle and Littlefield, was a part of the consideration of
this contract of February 16, 1872. As to the matter of
the adjustment of the account between Sanderson & L'En-
gle and Littlefield, arising out of the contract of April 15,
1871, Littlefield says "that he exhibited to L'Engle,
sometime in the summer or fall of 1871, a statement in
writing showing the sums of money I had paid to J. P.
Sanderson and the firm of Sanderson & L'Engle, and the
dates at which the moneys were paid, and the interest upon
each item with a view of having a settlement made accord-
ing to the understanding, as I understand it, of a contract
to be made between Sanderson, L'Engle and myself shortly
after the 15th day of April, 1871. I cannot say whether
L'Engle took the paper in his hands or not. He was not
inclined to consider the paper. The subject matter of it
was discussed between us and postponed for consideration
at some future day. It never was referred to again to the
best of my recollection until the contract was made on the
16th of February, 1872," (the contract under which L'En-

gle charges himself with the $4,166.66, which sum he then claimed for Sanderson & L'Engle, and Littlefield allowed, and which was part of the consideration enuring from L'Engle to Littlefied.) "The contract that I refer to was the one in which Sanderson was to account for moneys in his hands which I have already testified to." This attempt of Littlefield's at a settlement was effective for nothing. As further explanatory of the circumstances under which the contract of February 16, 1872, was made, Littlefield says: "In the summer of 1871, when E. M. L'Engle went North, our relations were friendly. During his absence and without consulting him, I conveyed the J. P. & M. Railroad Company to three trustees. This offended him very much, and when he returned late in the fall he informed me that in his judgment I had done a very foolish and unwise thing, and that he was opposed to the trust deed, and that he should resign as attorney of the railroad company and fight in the courts and otherwise the deed and the policy that was adopted by the parties then in charge of the road. In January, 1872, there was a bill pending in the Legislature of Florida authorizing the issue of two millions of dollars in bonds by the State to the J. P. & M. R. R. Co. There was great opposition manifested in and out of the Legislature to the passage of that bill and Messrs. Chase and Flagg and myself were anxious to overcome all opposition possible so as to secure the passage of the bill. We were afraid of Mr. L'Engle's opposition, he then being in Tallahassee. While he said nothing, we were afraid of his reticence and concluded it was better to make almost any settlement with him, even if we settled at his terms, than to attempt to get the bill through with his opposition. Mr. L'Engle claimed that because I had conveyed the road in trust, and the trustees having selected other attorneys, that I had violated and broken the con-

tract of April 15th, 1871, and that he had a right to claim
the full consideration named in the contract. Now it was
for these considerations and desiring to have an amicable
adjustment with Mr. L'Engle that I entered into the con-
tract." It is thus apparent that the consideration which
L'Engle gave to Littlefield for his part of the contract of
February 16, 1872, was the rights of Sanderson & L'Engle
(and the rights of L'Engle as survivor, if any existed) un-
der their contract of April 15, 1871, by which Littlefield
was to pay the firm of Sanderson & L'Engle $20,000 per
annum for and during the term of three years commencing
on the 15th of April, 1871. While Sanderson interpreted
the contract of April 15, 1871, as allowing $20,000 per an-
num and L'Engle acted upon such construction, Littlefield
says it was $15,000 per annum. The Circuit Court has
permitted in this conflict the charge to stand as L'Engle
himself placed it, and we cannot say that the court should
have reduced it to the sum due according to the $15,000
rate. Nor do we understand that such reduction is claimed.
The objection is to the entire charge. The books and the
testimony of L'Engle disclose the history of the debit entry
upon the books to be this: Under date of June 30, 1871,
L'Engle debits himself with $4,166.66, in these words " E.
M. L'Engle to this amount assumed by you of liability of
railroad companies for salary as attorneys under contract
made April 15, 1871, the said amount being two and one
half months of such salary, the whole time of Sanderson's
life after contract was made. (See papers in tin box in safe.)"
While the entry is placed on the account as of June, 1871,
the entry was in fact made between Oct., 1873, and June, '74.
The entry remained in that form until sometime in 1877 after
the commencement of this suit, when L'Engle testifies he
was making a memorandum by which W. A. Young could
make up the account of each member of the firm with the

firm. At that time L'Engle says: "I inadvertently erased that entry on the blotter, writing across it in black ink these words: 'This is wrong. It is an assumption by me without consideration.' Before I had completed the memoranda for Mr. Young I restored the entry to its original form by writing across it in red ink these words: 'The entry seems to be correct as originally made. Let it stand.'" There are other considerations recited as enuring from L'Engle to Littlefield under this contract, such as the transfer to Littlefield of certain stocks which L'Engle held as trustee. Littlefield in consideration of these matters gave his two promissory notes to L'Engle in his individual capacity for $25,000 each. These notes, while they have been reduced to judgment, have never been paid by Littlefield. The debt due by Littlefield to Sanderson & L'Engle it is thus apparent was used by L'Engle in this contract with Littlefield. He, L'Engle, released it in consideration of the notes of Littlefield, and he properly charged himself with it in the accounts of the firm of Sanderson & L'Engle, to whom it belonged. It was not his individual property. Thus the account and charge stood when this case was remanded; L'Engle had made no exception to it. Under the consent of parties it was made the subject of a rehearing in the Circuit Court after the case was remanded and under the peculiar circumstances of this case, and for the reasons stated in the previous portion of this opinion, we examine it here again against the general rule controlling the subject. What are the grounds now upon which L'Engle seeks to have this, his own charge against himself, and which was unquestionably a proper charge, cancelled?

The testimony of L'Engle upon this subject does not set up any new fact in reference to this charge. He states that when he made the charge it was in connection with the credit entries of $35,000 and $998.33 made at the same

time ; that he " knew that the item was not a legal charge against him ;" that there was no liability on him to account for that sum which had never been received by him, that because there was a large sum due him he was willing to set off against that credit all sums, even though he was not bound for them, which the most exacting person could say or think he ought to be bound for. It might, he says, have been thought by some persons that if I had not refused to be longer in the professional service of Mr. Littlefield and the J., P. & M. Railroad Company and had not assumed an attitude of hostility and active opposition to him and his schemes, I might have collected a large amount on the so-. called contract of April 15, 1871. That having chosen to act as he did in that matter, that is to say, independently and in accordance with his own sense of professional dignity and propriety, and having as he believed due to him one-half of the sums of thirty-five thousand dollars and nine hundred and ninety-eight 33-100 dollars of fees which his late partner had collected and had not accounted for, he chose to forestall all unfriendly criticism by charging himself with the item of $4,166.66, being all of the interest which J. P. Sanderson's estate would have had in the fruits of that contract if full payment had been made to him under it. Without adopting his language, we state that the administrator in his further statement says in substance that, except upon the hypothesis of his being allowed to share in the $35,000 and $998.33, he would not have made the entry ; that he did not anticipate any suit, or any but the most friendly relations with Mrs. Sanderson and her brother ; that afterwards when these relations changed, thinking that he was not liable, he wrote the words which are found across the charge cancelling it ; that afterwards he thought it was not proper to make such a change while the litigation was going on, and because he was willing to

the set off stated he wrote in red ink the second indorsement; that both of the indorsements were intended to be mere memoranda. He reiterates that the money was never received by him and that he was not liable for it; that the Supreme Court having disallowed the item of $35,000 and $998.33 he is not willing that the charge of $4,166.66 should stand as a charge against him. He further states that the Supreme Court having decided that J. P. Sanderson received in advance all that, in any event, his estate could have claimed under the contract of April 15, 1871, the charge of $4,166.66 against him is now clearly wrong, if it ever could have been claimed to be right. He also states that the entry was made on the books by him in ignorance of the fact which he learned after the commencement of this suit that Sanderson had been so paid in advance. Analyzing this testimony it may be said:

First. To be explanatory of the changes in the entries upon the subject of this charge. What may have been the particular state of mind in which the witness was at the date of these several entries can neither enlarge or restrict his liability.

Second. The expression of the opinion that because this was one of two entries made by him in reference to fees which he thought, considered and treated as dependent one upon the other and one of them a credit, which he claimed being rejected by the Circuit Court and by this court, he should be released of the other, which was a debit that he admitted and made. This credit and debit, it will be seen, refer to different matters. There is no dependent connection between the $35,000 and the $4,166.66. As to the matter of the $35,000 it was disposed of on the former appeal, we think correctly. We deem it unnecessary to repeat here what was there said. In addition to what was there said, we may, however, ask, why was it that no en-

try of this sum was made upon the firm books as for professional services during Sanderson's lifetime?

Third. Because the Supreme Court had decided that Sanderson had received in advance all that, in any event, his estate could have claimed under the contract of April 15, 1871. This court holding that Sanderson as the representative of the firm of Sanderson & L'Engle had been overpaid necessarily held that L'Engle had as much interest in the money received in excess as Sanderson had, because his act was for the firm, and now upon the same principle L'Engle having received a consideration for the sum of $4,166.66, and having made it available in this contract with Littlefield as an asset of the firm, he cannot expect to share in over-payments by Littlefield to Sanderson, and yet deny to Sanderson's estate its share here. It is admitted that L'Engle got this credit. He availed himself of this claim, and whether it was well founded was a question between him and Littlefield. So also the fact that L'Engle was ignorant of Sanderson's receiving of Littlefield sums in excess of what was due the firm of Sanderson & L'Engle is no more reason why Sanderson's estate should not participate in whatever of the assets of the partnership L'Engle made available, than it is that L'Engle should not participate in what Sanderson received beyond what was due the firm of Sanderson & L'Engle. In the case of the money received by Sanderson, the $14,600, we remarked in the opinion upon the former appeal that Littlefield yielded any and all claim to recover back such sums by this agreement of the 16th February, 1872. The like remark is applicable to this sum of $4,166.66, as the language of the contract clearly embraces all such sums. I can see no difference between the charge for $14,600, and the charge for $4,166.66 except that the $14,600 was in cash received, and the $4,166.66 was an asset

used and made available by L'Engle in this contract, in which he received two notes from Littlefield for $25,000 each.   Whether he has realized anything from the $50,000 in notes is a matter which does not affect the question and therefore what appears in this record, as to the purchase of certain stocks by L'Engle as the agent of Washington, and Littlefield's testimony upon the subject of the judicial proceedings in this matter, are immaterial. L'Engle made the asset available; and he was properly charged with it under the circumstances stated.

The next ground of appeal, (the sixth of defendant,) is because the master charged L'Engle interest on the balance found against him in the partnership account from the 25th of May, 1877.   We are embarrassed in the consideration of this subject for the want of any assistance from either party. Neither of them express their views, and all that defendants' counsel, who makes this exception says, is " why from the 25th day of May, 1877 ? "  In the opinion rendered upon the former appeal, we said nothing as to the time from which or the amounts upon which L'Engle, as surviving partner, was to pay interest.   We simply stated that the interest to be paid, if any, would be the legal rate, and that it should not be compounded, remarking at the time that " the debt here, if any exists, involves an accounting to ascertain it, and arises from a partnership relation." We think that the surviving partner here should, at least, pay the interest upon such balance as is found due by him by the master upon a general accounting as to the partnership transactions, because although the suit was then in progress he might have paid the ascertained balance into the court for the benefit of the parties entitled.   In the case of Beacham's Assignees vs. Eckford's Executors, 2 Sand. Chy. Reports, 116, this was the rule adopted.   The vice Chancellor in that case reviews the cases upon the sub-

ject of interest between partners. It will be there seen that Chancellor Kent expressed the view in an opinion that the date of the dissolution was the proper time from which interest should be charged. Stoughton vs. Lynch, 2 John. Chy., 209. In the case of Dexter vs. Arnold *et al.*, 3 Mason, 289, Judge Story says: " Interest is not allowed upon partnership accounts generally until after a balance is struck on a settlement between partners unless the parties have otherwise agreed or acted in their partnership concerns." In this case the master followed the rule announced in 2 Sand. Chy. Reports, and his action was certainly not to the prejudice of the defendant, L'Engle. Chancellor Kent's view that the date of dissolution was the proper time from which to state a balance to bear interest, we do not think applicable to the circumstances of this case, if indeed it is the correct general rule. As I understand the charge here, it cannot be objected to as excessive as it represents a balance found due by the surviving partner to the estate of the deceased partner, and the interest is charged from the time the balance is ascertained and became a liquidated sum.

The next ground of appeal (the seventh) of the defendant is to the master's charge of $1,308.74 on account of the judgment against Bettelini and Togni as of the 5th day of June, 1881.

The reasonable conclusion, from the testimony bearing upon this matter, is that the balance due upon a judgment which the estate had against these parties, which debt was also secured by a mortgage, could have been readily collected by the 5th of June, 1881, by the administrator with the use of that reasonable diligence and care that a prudent man exercises in his own affairs. Our views upon this subject after a review of the English and American authori-

ties are expressed in the case of Shepard's Heirs vs. Shepard's Adm'r., 19 Fla., 328 to 332.

The ground of appeal is not well taken.

The next ground of appeal of defendant, (the eighth,) is because the defendant was charged " compound interest on moneys not actually reduced to possession." The party who makes this exception, the defendant, does not state any particular item or charge in which this has been done and we do not propose to look through several volumes of a record in search for illegal charges of any kind for either party. Such exceptions, in the language of the Supreme Court of the United States, are to be regarded as " frivolous."

The next ground of appeal of defendant, (the ninth,) is because the master charged the defendant interest on funds of the estate in his hands which have been or may be distributed to the infant complainant during the period in which there was no one authorized by law to whom he could properly pay such funds. This is a good reason why the administrator should not be required to pay over the funds of the infant in his hands to a person who wishes to receive them, but who is not authorized to do so. Such is the case here with Mrs. Sanderson. But because there is no guardian of an infant is no reason why funds in the hands of an administrator in which the infant has an interest is not to bear interest during the administration. Under the statute he is clearly chargeable with this interest. In addition to this, the remarks made as to the last exception are applicable here. 2 Daniel's Chy. Prac., 5 Am. Ed., 1,316, note 4, 1,309.

The tenth ground of appeal of defendant is because " there is error in the balance fund against the defendant L'Engle, both as administrator and surviving partner, and on the final accounting." This is likewise a frivolous ex-

ception within the meaning of the authorities. Independent of this, however, it must stand or fall, as the particular items excepted to are allowed or disallowed, and is thus disposed of.

The only remaining questions to be considered in these appeals arise out of the third ground of appeal of defendant, and the fifth, sixth, seventh, eight, ninth, twelfth, thirteenth and fourteenth grounds of appeal of the plaintiffs, all of which are in reference to costs.

The ninth and twelfth grounds assigned by plaintiffs involve the question whether the administrator, in addition to his allowance of $4,000, " as a fair and just compensation for his services," is also entitled to an allowance of two hundred and fifty dollars per annum for his services from May 31, 1876, to May 31, 1883. This is a matter of statutory regulation and there is no authority for an annual allowance in addition to what is decreed as " a fair and just compensation for his services." We have stated our views as to this matter when treating of defendant's second ground of appeal. See page 319 of this volume. As we have observed, there are several heads under which compensation is allowed an administrator. This being so, and the allowance here of four thousand dollars being made under but one head, it is evident that if the estate had been so conducted as to result in allowances to the administrator under the other heads, his compensation would have been considerably increased. Indeed such an allowance ($4,000) might then perhaps have been properly excepted to by plaintiff as excessive. An allowance for services, care and attention should not be in such an amount as to compensate for other allowances to which the administrator has forfeited his right under the statute. The exception here is by the administrator on the ground that it is not enough and the exceptions of the

22

plaintiffs are to the other allowances and to costs. This allowance cannot be sustained.

The seventh ground of appeal by plaintiffs is the allowance of $20.75 for a copy of an opinion of this court on the former appeal. In the bill of costs filed in this court there is this entry : " Certified copy of opinion to Circuit Court, $20.75." The judgment for costs of this court is against the plaintiffs for the sum of fifty dollars and eighty-six cents, and this sum embraces the item of $20.75 for the copy of the opinion certified to the Circuit Court. It thus appears that the charge must have been for an additional copy for the use of the defendant. It has never been the practice in this court to allow any costs for copies of opinions in the case thus furnished. Where an opinion is ordered to be certified to the Circuit Court, then its cost is taxed in the bill here. Either party desiring an additional copy must pay for it in the same manner as he does when he takes a copy of any of his adversary's pleadings in the Circuit Court, or a copy of a decree in a case therein for his own use. .

The sixth ground of appeal of plaintiffs consists of objection to the allowance to the defendant of two hundred and twenty-nine dollars costs incurred by him for a copy of the record of this cause upon the former appeal to this court. This item of costs is incurred by one of the appellants after the entry of the decree and of the appeal therefrom in the Circuit Court. It concerned the appeal and was not the subject of taxation in the Circuit Court. The practice is to tax in this court the costs of a copy of the record of the decree of the Circuit Court upon the receipt of the Clerk of the Circuit Court for the amount paid him for it, when the decree is reversed. So far, therefore, as the administrator was entitled to any part of this sum paid as costs, it was the subject of taxation upon the former appeal

by this court, and not by the Circuit Court upon remanding the cause, as it was no part of the costs of that court. A different practice prevails in the Supreme Court of the United States, but it is under a rule covering the precise subject. The practice as we state it is the practice in this State and in other States. Worcester National Bank vs. P. D. Cheney, 94 Ill., 430.

The fifth ground of appeal is the charging of Marion H. Sanderson with four-fifths of the costs incurred in the case prior to its being remanded to the Circuit Court in June, 1880. The ground upon which this order seems to be placed both by the Circuit Court and the administrator is to some extent the fact that this court upon the former appeal found that the infant had not sued by her next friend and that the widow had failed to allege her election as widow to take a child's part, and that we remanded the cause with leave to make the necessary amendment. 17 Fla., 830. We think that this amendment should have been allowed upon payment of the costs of the amendment alone. I have been able to find no case in which under like circumstances greater costs were imposed. The equity of the bill cannot be denied. There was a favorable decision for the plaintiffs upon the equity of the bill and the jurisdiction, and as it was within the power of the court and conformable to its rules of practice the amendment should have been allowed, we think upon the same terms at least that the court would have permitted an amendment by plaintiffs upon demurrer by defendant. If, upon the hearing of a demurrer or other pleading raising the question, the demurrer was sustained and amendment allowed, the costs of such demurrer would have been allowed but no more. Here there was a demurrer by the administrator, but the grounds upon which this court acted were not assigned by him, and the demurrer, as we have

formerly held in view of the cases covering the precise
point raised by it, was properly overruled. Where a de-
murrer sets up certain grounds upon which it is based, and
these grounds are not found sufficient in law, it is some-
times the practice to charge the costs of the demurrer even
though the bill is held defective upon grounds alleged *ore
tenus*. See this general subject discussed in 1 Daniel Chy.
Prac., 5 Amer. Ed., §599. Certainly where the amend-
ment is directed by the court *sua sponte*, the defendant
should stand in no more favorable position than he would
if he.had himself called the matter to the attention of the
court. On the contrary, his failing to object, and going
into the proofs and hearing, is rather a ground for favor-
able action·to the other side. Harrison vs. Righter, 11 N.
J. Eq., 395. We do not think the fixing of the proportion
of costs incurred to be paid by Mrs. Sanderson in this suit
at the rate specified should be influenced to the extent it
apparently has been by the fact alluded to. As to· what
was said upon the former appeal in this case as to a statu-
tory requirement of a bond by the next friend, it has been
overruled since that case. Pace vs. Pace, 19 Fla., 448.
Nor do we think it can be said as to the suit in its entirety
that the distributees were the failing parties. The admin-
istrator as surviving partner had failed as to his charge of
$35,000 against the firm and the allowance of the Baxter
account and the claim to share.in the commission realized
by Sanderson from the sale of the stocks mentioned. The
distributees failed likewise to sustain themselves in many
particulars. We think, however, that the question of costs
as between party and party as well as costs as between at-·
torney and·client should be regulated here more by a con-
sideration of the general nature of the suit than by the fact
as to who in point of money is the successful party in the
controversy.

This suit is of a two-fold character—First. A suit for account and distribution by distributees against the administrator. Second. A suit.by the distributees of a deceased partner against the surviving partner for an account and decree, the surviving partner being the administrator of the deceased partner. We think, looking to the authorities, that as to the matter of costs it is not a very material fact that the administrator is found indebted in such a suit. This is usually the case and does not fix the rule as to costs of either side, while in the adjustment of partnership accounts if there is such resistance as has been made here by the surviving partner, if there is no account made by him to the parties beneficially interested in the estate of the deceased partner for over five years after the death of the deceased partner, and when an accounting is sought by those interested, a claim by the survivor of $35,000 is rejected and he is charged with a claim of over $4,000, which he resists, then the surviving partner has no claim to costs, either as between party and party, or attorney and client. He should be charged with the entire costs when, as in this case, he fails in the suit and is found indebted. Certainly plaintiff, in such a suit as this, should not be made to pay any part of defendant's costs, and it cannot be because there happens to be a fund in defendant's hands as administrator, *not as surviving partner*, in which the plaintiff is interested as distributee that that fund can be drawn from to pay defendant's.attorney as surviving partner. The general rule as to costs in settling partnership accounts in cases of this character, is stated by Collyer to be " that the party against whom the balance is reported is *prima facie* the person to pay them." Coll. on Part., Sec. 12, page 188. This rule must control here, in so far as the costs incident to the settlement of the partnership transactions are concerned. The surviving partner who is found to be the debtor under the

circumstances stated above should pay them. As a matter of course, what we say here is in view of the distribution of costs. So far as L'Engle urging any claim or resisting any charge in this partnership matter is concerned, he had the same right that any other person would have under the same circumstances. He thought he was entitled to the credits and had a right to claim it, and have the matter adjudicated.

As to the matter of the administration, we conceive the rule to be, notwithstanding the disallowance of some of the claims of the administrator, and notwithstanding the fact that upon an accounting he is found indebted to the distributees, that he is entitled to his costs as between party and party, and also to any reasonable charge which he has incurred for attorney's fees in the matter of his accounting. This, as a matter of course, when the administrator has acted in good faith, without fraud, and his administration is attended by the circumstances usually existing to entitle him to such allowance. In this case much has been said by counsel as to inability of the minor to give bond, and the unwillingness of the adult plaintiff to accept anything except a full transfer of assets. These requests were properly unattended to by the administrator because with outstanding debts it would have been a violation of his duty to creditors who have the paramount claim. This, however, would be no excuse for unnecessary delay in winding up the estate, for that is the first duty of the administrator, as in it is involved the speedy execution of his trust to all parties in interest. In this case the delay resulted in compromises very favorable to the estate. The estate has lost nothing. The administrator is here entitled to such attorney's fee as would be proper in case of an administration of this character, such fee to be fixed independent of any consideration of the service rendered in

connection with his contest as surviving partner, and his entire costs of administration are properly chargeable against the assets in his hands or the moneys which he is to pay in lieu of them in the event distributees see proper to hold him to his statutory liability in case of investments not approved by the Judge of the County Court. These costs are to come from the fund and are not to be taxed against Mrs. Sanderson alone. The minor's interest in the fund is subject to this charge. Mrs. Sanderson is not responsible for the costs of her co-plaintiff. If not paid from the estate the costs would go against the next friend. Here they should be charged to the infant, as the suit is in good faith and for her interest by him. Taner vs. Irie, 2 Ves. Sr., 466, by Lord Hardwicke; Bowling vs. Scales, 1 Tenn. Chy., 618; Union Ins., Co. vs. Van Renssalaer, 4 Paige, 87; Fearns vs. Young, 10 Ves., 184; Crump vs. Baker, 18 Ves., 285; Osborn vs. Dennie, 7 Ves., 425.

What we have said covers the fifth, eighth, thirteenth and fourteenth grounds of appeal of plaintiffs, and the third ground of appeal of defendants, and disposes of the case.

There are some other objections made by the plaintiffs to the conduct of this suit in the matter of costs. We give them brief attention. It is insisted that there is a large amount of testimony here concerning the separate estate of Mrs. Sanderson. This is true, and by reference to the record it is seen that plaintiffs introduced the subject, and they have no ground to complain of its irrelevancy when the subject of costs is being considered. It is insisted that L'Engle occasioned the accrual of unnecessary costs in proving his accounts item by item, and that he should have brought his accounts in in the form of debtor and creditor, as required by the rule. The plaintiff had access to L'Engle's accounts in the County Court. He also objected to

the master's taking L'Engle's accounts and exhibit to his answer, as the foundation for the account therein stated. In addition to these facts, however, it is too late now to make such an objection available. The time to object was before the master, when he proposed to state the account. As to the matter of proving the accounts, the plaintiffs had a right to proof and if they wished to save costs, they could have readily waived it. Instead of that there was persistent objection of one kind or another and even so late as upon the former appeal it was objected that the accounts were not proved. Even the books of original entry of the firm of Sanderson & L'Engle were objected to as " immaterial to the issues in this case."

The decree is in all respects affirmed except as to costs, and the case will be remanded with directions to have a retaxation of costs in accordance with the principles announced in the opinion herein rendered. Such order to cover costs accruing up to final decree.

Each party having failed in their appeals to this court, will pay their own costs here.